# DE GROOT v. UNITED STATES.
## No. 7511.

Circuit Court of Appeals, Ninth Circuit.
June 17, 1935.

George Grigsby and H. L. Faulkner, both of Juneau, Alaska, for appellant.

Wm. A. Holzheimer, U. S. Atty., and Geo. W. Folta, Asst. U. S. Atty., both of Juneau, Alaska.

Before WILBUR, GARRECHT, and DENMAN, Circuit Judges.

DENMAN, Circuit Judge.

This case comes up on an appeal from a judgment following a conviction of Harry De Groot, barber and electrical worker, of the second-degree murder of Abe Hansen, moonshine purveyor, in Chichagoff, Alaska.

The errors assigned have to do with instructions concerning the obligation to retreat, and the belief in immediate danger of death or great bodily harm as elements in the law of killing in self-defense, and the burden of proof required when that defense is raised. They also concern comments by the court alleged to reflect on the credibility of Josephine De Groot. She was the sole corroborating witness of her husband's testimony as to the facts leading to his shooting of Hansen and his state of mind at that time. A proper consideration of the assignments requires a somewhat extended statement of the testimony of the husband and wife as affecting the challenged validity of the court's instructions.

The immediate scene of the homicide was the small cabin and narrow deck outside the "Wa Wa," a powerboat belonging to Doc McIver, moored near the village of Chichagoff on the island of that name. The entire scene encompassing the facts motivating the actors in the tragedy includes the moonshiner's cabin near Hirst, situated on a trail from Chichagoff over a snow covered mountain. The trail ended on the beach below the cabin. The killing terminated the quest of Harry De Groot, who, at the end of his long Alaskan winter in Juneau, left for Hansen's cabin to reclaim his wife, Josephine, the mother of his four children. The wife had been living with Hansen as his housekeeper and companion. Hansen, whom the uncontradicted evidence shows to have been a powerful, hard drinking and violent tempered bully, determined to keep the woman for himself. During the winter he proposed that Josephine divorce De Groot, which the woman refused to do. Josephine told him De Groot was coming from Juneau, and he said, "He better not come out here and try to take you away from here." He said he would kill both of them if she tried to leave. The jury was entitled to believe, from the relationship of the parties, that the wife told the husband what Hansen had said.

De Groot, forty-six years of age, was 5 feet 7 inches tall, weighed 145 pounds, and was suffering from rupture. At no time did he have any weapons of his own. Hansen was 36 years of age, 6 feet 2 inches in height, weighing 225 pounds. He carried a revolver; kept a blackjack under

the mattress of the bunk in his gasboat, where he also had a rifle. Josephine had left Juneau in the late preceding summer for Chichagoff, some 200 miles away, to seek employment there. De Groot's first letters to her were returned, but later messages were answered by her.

On March 17th, the break of winter, De Groot traveled to Chichagoff in the "Wa Wa," where he arrived at about 5 o'clock on Sunday evening, March 18th. After supper he started out on the trail over a mountain to Hansen's cabin. The trail was heavily blanketed in snow, in places 10 to 15 feet deep, sufficiently thawed to force the traveler to plunge in up to his waist. It was raining and snowing at times. On the top of the mountain, where the snow lay 15 or 16 feet deep, De Groot sank to his shoulders. It took 4½ hours to cross the 1½ miles of the trail in the snow. He arrived at the Hirst Chichagoff mine at 10.30, where, after receiving instructions as to the location of Hansen's home, he started out again. One had to work along the beach to get there, but the path was unfamiliar to De Groot and the snow was increasing. His searchlight went out and, trapped by the tide in the dark, he was compelled to retrace his steps and spend the night in the snow storm. He built a fire of some wet boards on the beach. There was no heat in the fire, nothing but smoke. He sat over it in a sort of semiconscious state; his hands burned and his eyes nearly blinded by the smoke.

In the morning he worked his way back to the Hirst Chichagoff mine, where the men gave him some boracic acid and an eye cup. He stayed until dinnertime, but could not eat. Half an hour after noon he waded through low tide and wandered down the shore until before the cabin. Josephine saw him and came to him. He said, "Come after me, I am almost blind." She took him to the cabin, put him in his rival's bed, the only one in the house. She placed rags soaked in canned milk over his eyes. While he was lying there with the poultices over his eyes, Hansen came in. He went out again and returned very angry. He told Josephine that De Groot could never take her away from there and kept saying, "Why don't you get that son of a bitch out of there so I can make some money?" and he "will never take you away from me." Other threats continued all night.

Nearly all of Hansen's subsequent threats were accompanied by an assertion of De Groot's immediate female canine ancestry, and the suggestive sibilants of the frontier phrase spoken in the heated rage of the moonshiner, must have intensified the apprehension of the helpless husband. We are aware that the Supreme Court has considered the language, in hæc verba, in another Alaska case and taken judicial notice of it "as not unusual among coarse men employed in such an adventure," with the implication that by use it had lost its virtue as a major accelerator of fears of violence. Bird v. U. S., 180 U. S. 356, 358, 360, 21 S. Ct. 403, 45 L. Ed. 570. However, the circumstances of the adventure in that case were entirely unlike those surrounding De Groot in his journey to bring Josephine back home.

At 4 o'clock in the morning Josephine and a friend, Hi Parsons, who was present, but who died before the trial, persuaded Hansen to go down to his boat. The sick man remained in Hansen's cabin under continual threats, too ill to leave when Doc McIver came around by water that afternoon with his motorboat to take him away. He was confined there all of the Tuesday. Hansen drank freely of his moonshine and his threats increased in violence with his drinking. On Wednesday morning Hansen came to the cabin about daylight and said in De Groot's hearing to Josephine, "You know too much about me and my business and I think I'll bump the both of you off." At that time Hansen had a Colt gun with him, which he kept inside his belt.

Parsons later came in and cooked breakfast and De Groot got up for a cup of coffee and an egg, which he went outside and threw up. It was the first he had eaten since Sunday night. They were looking for Doc McIver to come over and take him away, but he did not come. Hansen became abusive, and Hi Parsons, to protect De Groot, came and lay on the bed with him. While there Hansen stated, "He will never live to sleep another night in my bed." Parsons "raised up" and replied, "Lay off him, Abe, the man is sick and blind and can't defend himself."

De Groot said, "Abe, I don't believe Doc is coming. If you will take me over to Chichagoff I won't bother you," and got up and put on his clothes. Hansen said to Parsons that he would take De Groot

"over and bump him off and throw him overboard, and nobody will know what became of him." De Groot then asked his wife for some weapon to protect himself, but she said, "No, Abe has the only gun with him." De Groot then said to Josephine, "Then go with me and give me a dog's chance to live anyway." Josephine told Hansen she was going with them to Chichagoff and Hansen said, "You better not try to stay and get away. If you do I'll kill the both of you." She replied, "Well, I will come back with you," and explained to the jury, "I was afraid if I tried to go with my husband he would kill both of us."

It was evening when they went down to the skiff and rowed over to Hansen's boat. The route by water to Chichagoff was about 14 miles. When about half way there Hansen stopped the motor, pulled out his gun and said, "you have lived long enough." Josephine grabbed the gun and said, "Abe, you will have to kill me before you kill him. The man is sick and is going away. Let him go." Hansen put the gun in his belt again. They proceeded to Chichagoff, where they tied up alongside Doc McIver's boat, the "Wa Wa," at about 11 p. m. De Groot, Josephine, and Hansen went into the cabin of McIver's boat and Hansen, finding there was no liquor on it, went over to his own boat and returned with two quarts of moonshine.

The cabin of the "Wa Wa," which contained the ship's motor, was so small there was not room for all to sit down. It had but one exit, a door aft on the starboard side to which one ascended by a companionway. Aft the companionway and in the same enclosure was the pilot house open to the cabin. A loaded rifle hung on the cabin wall, away from the companionway. Hansen's boat was moored on the starboard side of the "Wa Wa." The door to Hansen's pilot house opened towards the door of the "Wa Wa." A man six feet two inches tall could reach across into the pilot house of Hansen's boat without stepping over there. Hansen was carrying his pistol when he first came on the "Wa Wa." Later in the morning of the shooting the pistol was found in Hansen's pilot house, lying on a chair. Whether he left it there when he returned to get the moonshine, or whether it fell out from his blouse at the time of the shooting and was placed on the chair in the pilot house by some one else does not appear. De Groot testified that at the time of the shooting he believed that it was in Hansen's blouse.

Several hours were spent over Hansen's liquor. De Groot testified, "I did not drink, I was too sick to drink any moonshine. I was very sick; could hardly see; lungs all filled up with smoke. I ached all over and had neuritis in my shoulder for which Dr. Council doctored me months after."

Hansen drank heavily. De Groot was forward in the cabin, away from the door. Hansen and Josephine sat opposite one another, on each side of the motor. McIver was standing near the door. Hansen did not speak to De Groot during the session.

Finally Hansen and Josephine rose to leave and De Groot stated he wanted to say "goodbye" to his wife. She was then on the top step of the companionway with Hansen below her. Hansen reached in his blouse, where De Groot thought he had his gun, saying, "Stay down there, you son of a bitch, you are never going to live to get off this boat." Instead of drawing, he took his hand out of his blouse just as Josephine put her foot out the door, gave her a shove, and said, "Get out of my road, I am going to kill the son of a bitch." De Groot wheeled around, took the rifle off the cabin wall, turned and saw Hansen blocking the door, rushed up towards the companionway and shot Hansen in the chest. His testimony indicates his mental condition. "I was so excited. * * * I thought it was life or death with me at that time because of Abe Hansen making those threats. I was tortured two days and one night with those threats; seen him abuse my wife and threaten her. I last saw the gun on Hansen just as we got on Doc's boat. * * * He had it on him when he came on board." And: "He blocked the doorway when he reached for the gun and was standing right in front of the door. It was done so quickly and I was so excited and in fear that I cannot state the exact position he was in. I don't know which way he was moving. He had his right side to me partly, around facing me. He was right in front of the door. It looked to me that he was turning around from the position he was in. I was at the bottom of the steps when I grabbed the gun. I was at the foot of the companionway. I don't know exactly what position I was in; I was so terror stricken at that moment I

could not tell. I was there close to the foot of the companionway. I didn't put the gun to my shoulder, I stuck it up."

■ The above is a summary of facts testified to by De Groot and corroborated by his wife as to what happened after his arrival at the cabin and until the shooting. All of it was properly for the consideration of the jury as bearing on the condition of the mind of the frail and sick husband, who had retained no food since Sunday night, at the end of his enforced two days stay in the bed of his powerful and menacing rival for the possession of the woman, who had declined to divorce De Groot and had indicated she wanted to return to him. In analyzing the condition of the husband's mind at the moment of the killing, the paramount consideration is his knowledge that his life stood in the way of Hansen's continued possession of the woman, and that at the end of the shame and terror of this experience, and earlier in the night of the homicide, the woman had to seize the pistol in the hands of her paramour to prevent De Groot's threatened assassination.

■ The District Judge gave the following instruction: "And I instruct you that even though the deceased put his hands in the front of his jacket or blouse in the vicinity of where the defendant claims he was carrying a pistol, but that defendant saw and knew that the deceased did not withdraw a pistol therefrom and that the defendant saw the deceased push the defendant's wife out of the cabin door with both his hands, and followed her therefrom, and that deceased thereafter made no further hostile demonstration towards the defendant, then the defendant was not justified in shooting the deceased, and there is no self-defense in this case."

This instruction takes from the jury the right to infer that Hansen when reaching for his gun, on the first of his last two threats to kill, recalled that but a few hours before Josephine had grabbed it and prevented De Groot's assassination and hence, on his final threat, he pushed her aside to be free from a second interference. It prevented them from inferring that De Groot's terror, produced by Hansen's continued threats and an actual attempt to secure the woman by killing her husband, impelled him to believe Hansen would draw his gun and accomplish his previously avowed purpose, with a de-

liberation after the final threat that showed no immediate further hostile act.

The vice in the instruction is that it is conceived in the light of what De Groot "saw" and not what Hansen's acts might impel De Groot to believe, or more likely, feel in the often irrational area of human emotion.

The Supreme Court has declared the law with reference to the degree of detached reasoning required in self-defense cases, as follows: "Detached reflection cannot be demanded in the presence of an uplifted knife. Therefore in this Court, at least, it is not a condition of immunity that one in that situation should pause to consider whether a reasonable man might not think it possible to fly with safety or to disable his assailant rather than to kill him." Brown v. U. S., 256 U. S. 335, 343, 41 S. Ct. 501, 502, 65 L. Ed. 961, 18 A. L. R. 1276.

This case was cited as controlling in a self-defense case coming from Alaska to this court in Frank v. U. S., 42 F.(2d) 623, 625.

■ This specific instruction, based upon the choice of a few of the facts testified, but omitting what we have described as the paramount facts as to the state of De Groot's mind, emotions, and inferable impulses, is final in its declaration as to the absence of self-defense in the case. The error in such a specific instruction is not cured by later general statements concerning the right of the jury to take into consideration Hansen's threats. Mills v. U. S., 164 U. S. 644, 649, 17 S. Ct. 210, 41 L. Ed. 584; Drossos v. U. S. (C. C. A.) 2 F.(2d) 538, 539; Nicola v. U. S. (C. C. A.) 72 F.(2d) 780, 788; Owens v. U. S. (C. C. A.) 130 F. 279, 282.

All we have said above is based upon an acceptance by the jury of the testimony of De Groot and Josephine as true. Their statement that Josephine was pushed from the cabin and that Hansen made the threats described just before he was shot, opposes the testimony of Doc McIver, who stated that Josephine left the cabin before he did, that he was nearer to the "Wa Wa's" cabin than she was at the time of the alleged threats, and that he did not hear them. If the jury did not believe Josephine's corroboration of De Groot's story, they could well have inferred that an emotion entirely different from fear and terror moved De Groot when he killed Hansen. They

could have properly inferred that hatred toward his bullying rival for the woman, and chagrin that his long trip had failed to recapture her, motivated a last desperate effort to secure the woman for himself, while putting out of the way the man who had taken her from him. In this situation of the evidence, with these two possible conflicting inferences, the credibility of Josephine De Groot was of vital importance to her accused husband.

▮▮▮ In the course of the trial, the government sought to attack her credibility. It contested the fact of her marriage. She produced her marriage certificate. They asked her whether she had ever lived in the redlight district in Rossland, B. C. She denied it, and said she was living with her husband at the time in a respectable section of the town. The government offered no evidence of her reputation to follow up the suggestion of its question, with its shameful inference. In this situation the record shows the following, brought for our consideration by proper exception and assignment of error:

"Question by Mr. Faulkner: Mrs. De Groot, you said yesterday when you arrived you and your husband were out of funds and you went over to Chichagoff to see what you could do to earn some money. A. I did.

"Q. For what purpose did you go over there? A. Well, I had my two boys in Idaho, and wanted to get money to bring them up here with me so they could be with me.

"Mr. Folta: Object to that. It is meant to appeal to the sympathy of the jury and move to strike it.

"The Court: Motion sustained and the jury instructed to disregard it.

"The Court: This witness has followed a steady course during the examination of trying to build herself up.

"Mr. Grigsby: Except to the remarks of the court 'trying to build herself up' as commenting on the weight of the evidence, and prejudicial to the defendant.[1]

"The Court: The jury will understand that my remarks have nothing to do with the case. I am talking to the witness and not for the benefit of the jury; I am not impugning the purpose of counsel at all."

It is an entirely proper inference from the last remark of the judge that by selecting counsel in denying that he is impugning the purpose of "building herself up" he is emphasizing that purpose with reference to Mrs. De Groot. Instead of a plain withdrawal of the remarks and a specific instruction to ignore any impugning comment on her purpose to build herself up, the judge, in effect, says: "This is a private colloquy between the witness on the stand before you and myself. My impugning of her purpose in building herself up is based upon my private opinion. My private opinion has nothing to do with the case."

Mrs. De Groot was the accused man's only corroborating witness. The judge's private opinion of her "steady course during the examination" may have all to do with the case. It may be just the makeweight cast in the scale of the jury's minds to offset De Groot's evidence of self-defense. A federal judge's private opinion expressed to a jury of laymen necessarily must have "great weight" on their deliberations.

"It is obvious that under any system of jury trials the influence of the trial judge on the jury is necessarily and properly of great weight, and that his lightest word or intimation is received with deference, and may prove controlling." Starr v. U. S., 153 U. S. 614, 626, 14 S. Ct. 919, 923, 38 L. Ed. 841.

The error is not cured. It might have been if the truth of the judge's personal opinion were so clearly based on the record that the jury necessarily would come to the same conclusion and hence De Groot not suffer any prejudice. But that is not the case. Although stricken from the record for the jury, the colloquy set forth above brings into the record here the statement of Mrs. De Groot that: "I had my two boys in Idaho, and wanted to get money to bring them up here with me so they could be with me." It is a part of what the judge was criticizing when he stated: "This witness has followed a steady course during the examination of trying to build herself up." Her answer concerning the boys in Idaho and her desire to bring them to her is directly responsive to the question concerning her purpose in going to Chichagoff. It is not a volunteer "building up." We take it that neither in Alaska nor elsewhere in the United States can it be said of a wife, even if shown unfaithful to her husband, that she is trying "to build her-

---

[1] Contra to section 1023, Compiled Laws of Alaska 1913.

self up" by a denial of a contention that she is not married to the father of her children and that she had lived in a red-light district, or by the assertion that her purpose in seeking employment was to procure money to bring her children to live with her.

█ Nor is the error cured by a general statement, elsewhere in the long charge, advising the jury that it should ignore any statements made by the court concerning the weight of the evidence. What the judge said to the jury in effect was that his remarks were not evidence at all. Telling the jury to disregard anything he may have said or done regarding the evidence is not advising them to disregard his private colloquy with the witness. Nor was the impugning of her purpose certain to be removed, by asking them to disregard anything that might influence them in determining the facts of the case. Such general statements, remote from the occurrences at the trial, do not cure indiscretions of the judge where, as here, the harm caused is or may be ineradicable. Rudd v. U. S. (C. C. A.) 173 F. 912, 914; Sunderland v. U. S. (C. C. A.) 19 F.(2d) 202, 214; Sapp v. U. S. (C. C. A.) 35 F.(2d) 580, 581.

None of the cases cited in the government's brief on this point militates against our conclusion that the court's prejudicial remark was not obviated by general cautionary instructions, and that it constituted reversible error.

█ On the duty to retire, the trial judge charged the jury as follows: "As a general rule, in order to justify or excuse homicide as in self-defense, the defendant must have embraced all reasonable or probable means of escape or retirement within his power and consistent with his safety, so as to avoid the danger and avert the necessity of killing. As sometimes said, the rule is that a person must retire rather than take the life of another, unless he would thereby increase his peril or it reasonably appears to him that his peril will be thereby increased, as in law the right of self-defense does not arise until the accused has done everything in his power, as he sees it, to avoid the necessity of killing the deceased. And in this connection I further instruct you that where an accused acts under the appearance of necessity and the reasonable belief that he cannot retire without increasing his peril, he may justifiably kill in his own defense, even though as a matter of fact to retire would not have injured his personal safety. In other words, the question is not whether the jury believes that the defendant had no safe or apparently safe means of protecting himself from death or great bodily harm, but whether the jury believes that the accused believed, and had reasonable grounds to believe, that he had no safe or apparently safe means of escape or protecting himself from death or other great bodily harm other than the slaying of the deceased."

Discussing later the abstract proposition of law it contains, this instruction, as that concerning self-defense and De Groot's state of mind with reference to it, ignores the occurrences prior to the immediate time of the slaying. De Groot had already retreated from the cabin to the "Wa Wa" and Hansen had followed him into the boat in which he was leaving for Juneau. De Groot had a right to be where his wife was, a right the stronger for the coercion of Hansen in retaining her for himself. However, even if De Groot had not already retreated and had not been a husband seeking the return of his wife, and assuming the question of retreat was one controlled entirely by the limitations of the area of the two boats, the instruction was not justified by the evidence.

It is not disputed that Hansen's body blocked the only exit to the cabin at the time the fatal shot was fired. It cannot be contended that the small size of the cabin offered the slightest choice of points of comparative safety to one in the position of De Groot, if, as the testimony shows, his assailant was at or near the door. In fact, if the jury inferred that Hansen's threats and profound determination to keep the woman compelled the trapped man to believe that his murder awaited the time when the wife's protection, previously exercised, was absent, there was no place on the two boats to which he could retreat in safety. Certainly De Groot could not be expected to attempt to elude his assailant by swimming to Chichagoff through the March waters of the North Pacific.

Such abstract and hypothetical instructions, however correct in vacuo, are erroneous if not based on any evidence in the case, and, if prejudicial to the defendant, constitute ground for reversal. Beard v. U. S., 158 U. S. 550, 559, 15 S. Ct. 962, 39 L. Ed. 1086. The jury might well have

inferred from the charge quoted that as a condition of De Groot's justification he must not only have reasonably believed himself in deadly peril, but must, in addition, have considered whether the trap in which he found himself offered some place in which he could hide.

But even as an abstract proposition, the charge of the trial court was opposed to the law of self-defense as it has been declared in this court. As a corollary to the common-law doctrine of justifiable homicide in self-defense, the duty to retire has undergone extensive modification, if not outright repudiation, at the hands of the United States Supreme Court in a series of cases beginning with Beard v. U. S., 158 U. S. 550, 559, 15 S. Ct. 962, 39 L. Ed. 1086, and ending with Brown v. U. S., 256 U. S. 335, 343, 41 S. Ct. 501, 65 L. Ed. 961, 18 A. L. R. 1276.

This court had occasion to consider the classic doctrine in the case of Frank v. U. S., 42 F.(2d) 623, 626, where the defendant was indicted for homicide under the identical Alaska statute as was De Groot, and where, the issue of self-defense having been raised, the duty to retire was placed before the jury in a charge similar to the one under consideration. Reviewing the Supreme Court cases just mentioned, this court, speaking through Wilbur, J., repudiated the abstract statement given and held that the existence of a duty to retire depended solely upon the right of the defendant to be where he was at the time. That case puts it beyond doubt, so far as this court is concerned, that the possibility of retirement by a defendant fearful of his life is not in issue unless at the time of the affray he was an intruder upon the ground where the killing occurred. There is certainly nothing in the Alaska law which makes the presence of a husband on a gasboat, in his retreat from a quest to persuade his wife to return to him from the house of her consort, an intrusion into the latter's presence.

The appellant assigns error with regard to the instruction dealing with burden of proof on the issue of self-defense. He asserts that the instructions given are erroneous and complains of the refusal to give the following instruction:

"No. 12. As I have instructed you, the burden of proving the defendant guilty is on the Government. The defendant is not required to prove anything. The Government must prove him guilty beyond a reasonable doubt before you are warranted or justified in returning a verdict of guilty against him.

"The defendant, as I have just said, has pleaded self-defense, but you are instructed that the burden of proving self-defense is not on the defendant; that is to say, the defendant is not required to establish the defense of justifiable homicide or self-defense beyond a reasonable doubt nor even by a preponderance of the evidence, nor at all; for in order to convict the defendant you must find from the evidence, beyond a reasonable doubt, that the killing was not in self-defense."

This instruction is equivalent to saying to the jury even if you disbelieve the evidence as to self-defense and believe it proves nothing at all, nevertheless the prosecution must prove absence of self-defense beyond a reasonable doubt. Such blending of correct and incorrect statements, likely to confuse the jury, cannot be compelled by defendant's request. The instruction is clearly erroneous, and the court properly refused it.

On the issue of self-defense, where the prosecution rests with bare proof of the homicide, the burden of going forward with the evidence is on the defendant, and he must offer proof of facts upon that issue. It is not enough for him to say, "I did it in self-defense," whereupon the prosecution must establish the negative. The proofs of the accused are not required, to establish self-defense by a preponderance of the evidence. The evidence adduced, however, must be sufficient to require the consideration of a reasonable doubt as to the justification for the homicide. To that extent there is a burden of proof on the defendant.

The question then arises whether the court's instruction should frame the rule as to reasonable doubt in the terms of the prosecution's or the accused's burden Logically there is a possible distinction between the burden on the prosecution to prove the absence of self-defense beyond a reasonable doubt and the burden upon the defendant to prove affirmatively enough to create a reasonable doubt that he so acted. The burdens seem different if any value to the accused is to be given to the word "beyond" in the historic phrase "beyond a reasonable doubt." Proof beyond a reasonable doubt suggests something less than such a doubt; that the jury's minds must travel a less distance from the presumed

252

innocence of the accused. It suggests that something more may be required of the defendant to bring the minds of the jury to the full possession of a reasonable doubt than into the lesser area of belief beyond a reasonable doubt; an area between that "beyond" reasonable doubt and affirmative belief in the defendant's innocence. Certainly no defendant's attorney would hesiate to choose to have the instruction cast in the terms of the prosecution's obligation.

The Supreme Court in Davis v. U. S., 160 U. S. 469, 16 S. Ct. 353, 40 L. Ed. 499, and Matheson v. U. S., 227 U. S. 540, 33 S. Ct. 355, 57 L. Ed. 631, two murder cases presenting the defense of insanity, the second relying on the first, treats the two methods of stating the burden as the same. In the first, evidence of insanity having been adduced, the burden is described as on the prosecution to prove beyond a reasonable doubt that the accused was sane. In the second it holds that the court followed the law as established in the first case, by instructing the jury that the burden of proving insanity at the time of the killing was on the defendant yet the jury could not convict if they had a reasonable doubt as to his sanity. The value to defendant of a proof beyond a reasonable doubt is not recognized.

In Davis v. U. S., 160 U. S. 469, 487, 488, 16 S. Ct. 353, 358, 40 L. Ed. 499, the court describes the burden as follows: "Strictly speaking, the burden of proof, as those words are understood in criminal law, is never upon the accused to establish his innocence, or to disprove the facts necessary to establish the crime for which he is indicted. It is on the prosecution from the beginning to the end of the trial, and applies to every element necessary to constitute the crime. Giving to the prosecution, where the defense is insanity, the benefit in the way of proof of the presumption in favor of sanity, the vital question, from the time a plea of not guilty is entered until the return of the verdict, is whether, upon all the evidence, by whatever side adduced, guilt is established beyond reasonable doubt. If the whole evidence, including that supplied by the presumption of sanity, does not exclude beyond reasonable doubt the hypothesis of insanity, of which some proof is adduced, the accused is entitled to an acquittal of the specific offense charged. His guilt cannot be said to have been proved beyond a reasonable doubt— his will and his acts cannot be held to have joined in perpetrating the murder charged —if the jury, upon all the evidence, have a reasonable doubt whether he was legally capable of committing crime, or (which is the same thing) whether he willfully, deliberately, unlawfully, and of malice aforethought took the life of the deceased. As the crime of murder involves sufficient capacity to distinguish between right and wrong, the legal interpretation of every verdict of 'Guilty as charged' is that the jury believed from all the evidence beyond a reasonable doubt that the accused was guilty, and was therefore responsible criminally for his acts."

The second case is on error from the Territory of Alaska, reviewing a conviction for murder. The Alaska statute [1] provides that "in criminal cases guilt shall be established beyond reasonable doubt." The Supreme Court there holds: "It would serve no useful purpose to discuss the ruling as to the burden of proof and the definitions of insanity, since they present no new propositions. In both these matters the court followed cases in which those subjects have been fully treated. He instructed the jury that while the burden of proof was upon the defendant to establish the fact that he was insane at the time of the killing, yet they could not convict if they had a reasonable doubt as to his sanity. Davis v. U. S., 160 U. S. 469, 16 S. Ct. 353, 40 L. Ed. 499." Matheson v. U. S., 227 U. S. 540, 543, 33 S. Ct. 355, 356, 57 L. Ed. 631.

In accordance with the statement of the Matheson Case, this court held in Frank v. U. S., supra, 42 F.(2d) 623, 627, that: " * * * While the burden of establishing self-defense is upon the defendant unless the evidence of the prosecution discloses sufficient evidence thereof, the burden is sustained when, as a result of the whole evidence, a reasonable doubt has been created in the minds of the jury as to whether or not the homicide was in self-defense. If, from a consideration of the whole evidence, the jury entertains a reasonable doubt upon that question, that doubt is to be determined, like all other doubts in the case, in favor of the defendant."

It must not be inferred that the rule as expressed in the Frank Case would warrant the trial court to refuse its equivalent

[1] Compiled Laws of Alaska, 1913, § 1505, par. 5.

statement in terms of the prosecution's duty to overcome the evidence of the justification by proving the absence of self-defense beyond a reasonable doubt.

The burden of proof with regard to self-defense was far from being made clear to the jury in the instructions given by the court in the instant case, and appellant's assignment of error as to the second instruction is well taken. In his first instruction the judge charged the jury that they must find the existence of malice and intent to kill beyond a reasonable doubt. In the fifth instruction the jury were told that the government must prove every material averment of the indictment to their satisfaction beyond a reasonable doubt. Nowhere is reasonable doubt mentioned in connection with self-defense. On the contrary, in the second instruction concerning self-defense the court stated: "The question is not whether the jury believes that the defendant had no safe or apparently safe means of protecting himself from death or great bodily harm, but whether the jury believes that the accused believed, and had reasonable grounds to believe, that he had no safe or apparently safe means of escape," etc.

From the words, "whether the jury believes," it could infer that its belief must be upon a preponderance of the evidence, whereas it was required to believe beyond a reasonable doubt that De Groot had a safe or apparently safe means of protecting himself, etc.

Furthermore, the judge at the conclusion of the fourth instruction applies the requirement of reasonable doubt only to the determination of the degree of guilt they must find in the absence of self-defense. The language is as follows: "Then there is no self-defense in this case, and you will find the defendant guilty of such offence and in such degree as you may find beyond a reasonable doubt, all the facts and circumstances of the case warrant, under the evidence and the instructions I have given you."

This is clearly suggestive that the jury need apply the doctrine of reasonable doubt only to the degree of the offense and not to the issue of self-defense.

A specific instruction which is defective in respect to the burden of proof is not remedied by correct general statements of the law elsewhere given in the charge unless the general statement clearly indicates that its consideration must be imported in-

to the defective instruction. Drossos v. U. S. (C. C. A.) 2 F.(2d) 538, 539. That was not done in the instant case, and the erroneous instruction remained uncured.

On a consideration of the whole case, we conclude that the jury may have felt compelled by the instructions to bring in a verdict of second-degree murder, while their recommendation for leniency reflected the possibility of a different verdict if the erroneous instructions had not been given.

Judgment reversed.