## GARBER et al. v. UNITED STATES.

No. 9635.

Circuit Court of Appeals, Sixth Circuit.

Dec. 11, 1944.

Aaron Weiswasser, of Detroit, Mich. (Aaron Weiswasser and William G. Comb, both of Detroit, Mich., on the brief), for appellant.

Vincent Fordell, of Detroit, Mich. (John C. Lehr and Vincent Fordell, both of Detroit, Mich., on the brief), for appellee.

Before HAMILTON, MARTIN and McALLISTER, Circuit Judges.

MARTIN, Circuit Judge.

The appellants Edward Garber and the Garber Packing Company, Detroit, Michigan, a sole proprietorship, were convicted by the verdict of a jury on fourteen counts of a sixteen-count indictment, charging violation of revised maximum price regulation No. 169, issued by the Price Administrator of the Office of Price Administration, pursuant to the authority of the Emergency Price Control Act of 1942, 50 U.S.C.A.Appendix § 901 et seq. The convictions rested upon evidence of numerous sales and deliveries of beef by the defendant Garber at prices well known by him to be in excess of the maximum ceiling prices fixed in the regulation.

The district judge directed a verdict for the defendants as to the charges laid in counts 5 and 6. These two counts covered sales of beef to William Kurkowske. The evidence offered by the Government was considered insufficient to connect the defendant Garber with knowledge of the actions of his truck driver, Ryan, in delivering the beef to Kurkowske and collecting the unlawful purchase price. Both the district judge and the jury, as manifested by its verdict, found the evidence sufficient to justify the conviction of appellant in

connection with certain unlawful sales, covered in other counts of the indictment, where deliveries of beef had been made to the defendant's customers by his employee Ryan, who in each instance had collected an amount in excess of the lawful ceiling price in payment for the meat.

■ Appellant insists that the district court erred in declining to direct a verdict in his favor on nine of these counts, numbered respectively 2, 3, 4, 7, 10, 11, 12, 14, 15; whereof counts 2, 3 and 4 relate to sales to Frank A. Claramunt, counts 7, 10, 11 and 12 appertain to sales to Walter Wawrzynowicz, and 14 and 15 are based upon sales to Adam Wawrzynowicz. No sentence was pronounced on three of these counts, to wit: 11, 12 and 15. It follows that defendant has not been harmed by his conviction on them. Likewise, sentence was not pronounced on count 9. The contention is not made that there was no substantial evidence to support conviction upon counts 1, 8 and 16, relating to unlawful sales to Frank A. Claramunt, Walter Wawrzynowicz and Walter Kozielski, respectively. On the factual branch of the case, we are therefore concerned only with whether the district court properly submitted to the jury the issue of defendant's guilt as charged in counts 2, 3, 4, 7, 10 and 14 of the indictment.

With respect to counts 2, 3 and 4, covering sales to Claramunt, it must be borne in mind that Claramunt, a retail grocer, testified in direct support of the charge in count 1, that he bought on December 23, 1942, from the appellant, who was a wholesaler, 1,648 pounds of meat at twenty cents per pound, as indicated by the invoice; but that appellant computed on a separate piece of paper and collected an additional six cents per pound charge for the meat, in plain violation of the ceiling-price regulation. Claramunt testified that he paid this overcharge to appellant personally. He testified further that he purchased "additional meat" from Garber for which he paid like overcharges; but that only on the first occasion (that covered by count 1) was Garber present when the meat was delivered. The other overcharges covered by counts 2, 3 and 4 were calculated by Garber's delivery man, Ryan, and the unlawful amounts were paid to him. The transactions were conducted by Ryan in the same manner that the original transaction had been conducted by Garber. Claramunt testified that Ryan and a col-

ored helper accompanied Garber and were present on the occasion of his original transaction with Garber, but that Ryan was "not around" when the figures were computed and the amount of the computation paid to Garber.

In reference to counts 7, 10 and 14, pertaining to sales to two grocers who operated separate stores, Walter Wawrzynowicz and his father, Adam Wawrzynowicz, the observation should be made that Walter testified that the first beef which he purchased from Garber Packing Company was bought personally from the appellant who asked 28 cents a pound for it. Walter paid Garber's office cashier the price at which the meat was invoiced and paid, as required, the unlawful overcharge to Garber himself "in the ice box." On the witness stand, the young man stated: "I imagine I had similar transactions on three or four other occasions and I always paid the extra money to Mr. Garber in the ice box." Walter was always alone with Garber in the ice box when paying the overcharge and never paid "overage to anyone other than Mr. Garber or Mr. Ryan." He asserted that "it was on Mr. Garber's instructions to have the bills handy" that he had informed the O. P. A. investigators "when they came in" that he had paid only the ceiling price for the meat.

Adam Wawrzynowicz testified that on every occasion of a delivery to him of meat from Garber's, the driver in his presence multiplied on a piece of "butcher paper" the weight of the meat by 28 and demanded and was paid the resultant amount. The elder Wawrzynowicz had no personal dealings with Garber; his son ordered the meat sent to the father's store and Ryan made the deliveries. Whoever, father or son, received the beef was reimbursed by the other for his proportionate share of the price charged by Garber or his employee.

The testimony of grocer Walter Kozielski as to his purchases of meat from Garber discloses the same method of "black market" operations revealed in the instances of sales to Claramunt and to the Wawrzynowicz father and son. Kozielski testified that on January 28, 1943, he purchased from Garber 685 pounds of "good grade cattle" at 22 cents a pound, for which he actually paid 28 cents. He swore: "When I first started buying from Mr. Garber he told me in the cooler that I

would have to pay 28 cents a pound. He told me not to mark on the back of the bill the difference I paid, that I would get into trouble." In the ice box where the meat was stored, Garber instructed him to pay the girl in the office the purchase price shown on the invoice. The additional six cents per pound was simultaneously demanded and collected from him by Garber when they were together in the ice box. On some other sales to the witness, the same procedure was followed and, in one recited instance, Garber's driver who delivered the meat at Kozielski's store was paid the customary six cents charge over the ceiling price. From the evidence which has been briefly summarized, the jury obviously inferred from the circumstances that appellant's delivery man and collector was acting in well understood unlawful concert with him.

In the case of each of the sales where deliveries and collections were made by appellant's agent, the purchaser had been previously sold meat by Garber at a price in excess of the lawful limit, and Garber himself had demanded and received the unlawful overcharge. Garber's agent invariably collected on the deliveries of meat made by him at the same unlawful rate as that exacted by Garber in his personal dealings.

■ (1) In our judgment, the district court did not err in refusing to grant the motion of the defendants for a directed verdict. It is well established that, on such motion, the evidence must be considered in the light most favorable to the party against whom it is urged; and if substantial evidence has been introduced sufficient to take the case to the jury, no quantum of contradictory evidence will authorize the trial court to direct a verdict. Bogy v. United States, 6 Cir., 96 F.2d 734, 740. Cf. Vilson v. United States, 9 Cir., 61 F.2d 901.

The Supreme Court has said of its own reviewing function in a criminal case: "It is not for us to weigh the evidence or to determine the credibility of witnesses. The verdict of a jury must be sustained if there is substantial evidence, taking the view most favorable to the Government, to support it. United States v. Manton, 2 Cir., 107 F.2d 834, 839, and cases cited." The opinion writer added: "Participation in a criminal conspiracy need not be proved by direct evidence; a common purpose and plan may be inferred from a 'de-velopment and a collocation of circumstances.' United States v. Manton, supra." Glasser v. United States, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680. In the case cited by the Supreme Court from the specially constituted Second Circuit Court of Appeals, Mr. Justice Sutherland said (107 F.2d 834, 839): "It is not necessary that the participation of the accused should be shown by direct evidence. The connection may be inferred from such facts and circumstances in evidence as legitimately tend to sustain that inference. Indeed, often if not generally, direct proof of a criminal conspiracy is not available and it will be disclosed only by a development and collocation of circumstances. In passing upon the sufficiency of the proof, it is not our province to weigh the evidence or to determine the credibility of the witnesses. We must take that view of the evidence most favorable to the government and sustain the verdict of the jury if there be substantial evidence to support it. Hodge v. United States, 6 Cir., 13 F.2d 596; Fitzgerald v. United States, 6 Cir., 29 F.2d 881."

■■ The fact that the case at bar is not a formal conspiracy case does not affect the applicability of the principle that circumstantial evidence which connects the defendant with the criminal transactions of his known agent may be received and considered; for, as was pointed out in Cossack v. United States, 9 Cir., 82 F.2d 214, 216, "the common object of persons associated for illegal purposes forms part of the res gestæ, and acts done with reference to such object are admissible, though no conspiracy is charged." See, also, Lee Dip v. United States, 92 F.2d 802, 803, and Belden v. United States, 223 F. 726, 730, from the same circuit.

■ The jury was privileged to infer from all the circumstances, as the jurors evidently did, that Garber's delivery man and collector was acting for his principal in all the transactions covered by the challenged counts of the indictment. There was ample substantial evidence to support the inferences drawn by the jury in reaching its verdict of guilty on counts 2, 3, 4, 7, 10 and 14 of the indictment.

■ (2) Attorneys for the appellant emphasize far beyond its normal consequence the alleged error of the district judge in permitting the United States Attorney to cross-examine the defendant

Garber with reference to his bankruptcy in 1933 and in participating in such examination.

The episode of his previous bankruptcy was first mentioned by the defendant, himself. The United States Attorney was questioning him as to whether from July, 1942, into the fall of that year the O. P. A. had not been trying constantly to get him to file correct ceiling prices. The defendant, saying that he did not remember that, volunteered the statement: "My wife had nothing to do with preparing the ceiling prices; she merely helped me out. The business was in her name in July to November, 1942, but we both worked in it and both owned it, although the business was entirely in her name because I had been in bankruptcy about ten or twelve years ago. On January 2, 1943, my wife filed a discontinuance of business as the Garber Packing Company, as I told her I was going to take over the business and she need not come down any more."

Upon further questioning, the defendant repeatedly asserted that the business was in his wife's name "at that time." He said that both owned the business and had the same interest in it; or, to use his expression, "it was hers as good as mine."

The cross-examiner interrogated: "Your assumed name certificate does not show that you were doing any business out there as the Garber Packing Company?" The defendant replied that the business was all in his wife's name. Asked why it was in her name, he answered: "After I went bankruptcy."

Over objection, the district attorney proceeded to question the defendant concerning his assets and liabilities and some other details of his bankruptcy. The Court permitted to a limited extent examination along this line as going to the credibility of the witness. The test does not rest upon an erroneous assumption that one who has gone into bankruptcy is not to be believed. The legitimate purpose of the examination was to determine whether the defendant spoke truthfully in assigning bankruptcy as his real motive for carrying on business in his wife's name. Having volunteered his explanation, he subjected himself to cross-examination, within the sound discretion of the court, as to the truthfulness of that explanation.

The extent of cross-examination with respect to an appropriate subject of inquiry is within the sound discretion of the trial court, which may exercise reasonable judgment in determining when a subject has been exhausted. Alford v. United States, 282 U.S. 687, 694, 51 S.Ct. 218, 75 L.Ed. 624; Banning v. United States, 6 Cir., 130 F.2d 330, 337. In the last cited case, this court said at page 339: "The rule prevails that it is competent on cross-examination to develop all circumstances within the knowledge of a witness which qualify or destroy his direct testimony, although strictly speaking they may constitute new matter and are a part of the cross-examiner's own case." Even greater latitude is permissible in the examination of a party; but always within the sound discretion of the trial court. Twachtman v. Connelly, 6 Cir., 106 F.2d 501, 507. The principle has been clearly enunciated in United States v. Manton, 2 Cir., 107 F.2d 834, 845: "The office of cross-examination is to test the truth of the statements of the witness made on direct; and to this end it may be exerted directly to break down the testimony in chief, to affect the credibility of the witness, or to show intent. The extent to which cross-examination upon collateral matters shall go is a matter peculiarly within the discretion of the trial judge. And his action will not be interfered with unless there has been upon his part a plain abuse of discretion."

For further authority as to the discretion of the trial court, see Hider v. Gelbach, 4 Cir., 135 F.2d 693, 695; Weiss v. United States, 5 Cir., 122 F.2d 675, 690; Jelke v. United States, 7 Cir., 255 F. 264, 287, 288; Holmes v. United States, 8 Cir., 134 F.2d 125, 135; Rose v. United States, 10 Cir., 128 F.2d 622, 626; Viereck v. United States, 76 U.S.App.D.C. 262, 130 F.2d 945, 961.

We find no analogy to the case at bar in the facts of Daniels v. United States, 6 Cir., 196 F. 459, 464, cited by appellant. Of course, as was said by Judge Denison, the credibility of a witness cannot be tried "by *raising and trying an independent issue* as to his honesty, his interest or his motives." (Italics supplied). No such attempt was here made. The cross-examination concerning his bankruptcy, the fact of which the defendant himself had first divulged, did not transcend the reasonable limits of a test of his credibility as to the reason given by him for conducting business in his wife's name.

Other cases cited by appellant in support of his argument upon the assignment of er-

ror under consideration are not deemed helpful to his position. No abuse of discretion or prejudicial error appears in the rulings and remarks of the district judge in relation to the bankruptcy matter.

■■■■ (3) Appellant seems to grasp at straws in assigning as reversible error the allowance by the district court of the limited examination of appellant pertaining to his purchase of livestock on the Detroit market for shipment to Chicago at a time of meat scarcity in Detroit, and also concerning his evasion of his quota allowed by the Department of Agriculture. The defendant, himself, brought out the fact that he "quit the bull business about November 15, 1942, and went immediately into the beef business, occasionally buying livestock on the Detroit market and shipping it to the Chicago market." It was competent then to ask him if beef was not scarce in Detroit at the time. Asked by the district attorney whether he had employed means to evade his quota, the defendant answered that he had not; and the matter was dropped. No prejudice to him, therefore, resulted. See United States v. Frankel, 2 Cir., 65 F.2d 285, 288. Compare Dawson v. United States, 9 Cir., 10 F.2d 106, 108.

■■■■ (4) Appellant charges that the district court committed prejudicial error "in its statement in advising the jury relative to the dismissal of counts 5 and 6 of the indictment." These counts related to sales to William Kurkowske, who was not proven to have had any personal dealings with the defendant. The Government had introduced testimony that Claramunt, Wawrzynowicz and Kozielski were directly dealt with by the defendant in unlawful transactions. In explaining this to the jury, the court was careful to caution that the attempt was merely being made to "divorce" the two counts from the minds of the jurors. "You see," the court stated, "those are the cases where Mr. Garber doesn't appear at all."

As to certain other cases covered by the counts submitted to the jury, the judge asserted that, while he was not saying that "it was done," the testimony introduced by the Government tended to show that the defendant was "tied in in some way" with knowledge that his driver "was to get the twenty-eight cents, or he was to get it or somebody was to get it." The defendant's attorney was asked: "Do you think I have fairly stated it?" The advocate replied: "You may have fairly

stated it, but I think I should take an exception to the Court's statement."

"I was trying to do it in your behalf, not on behalf of the Government," the judge commented. "I was trying to identify these two particular indictments or counts, that is all."

"All right," interjected the attorney.

"So that none of that testimony might later prove injurious to the defendants, but if you want an exception you can have one, if that is your attitude," the judge continued.

"Yes," said the attorney addressed.

"All right," the judge resumed. "I certainly want it to appear on the record the Court was attempting to try to divorce that testimony from your minds entirely, because you will remember I said if they didn't tie Mr. Garber in with the activities of the driver I would dismiss as to those counts."

"I will take an exception to your statement," stated the counsellor.

"All right," from the Court; and the colloquy ended. A molehill does not become a mountain even though it appears such through the partisan binoculars of counsel. The judge was obviously trying to be fair. In further token of that spirit, he charged the jury with respect to the two counts which had been dismissed: "Now, because I have set them aside and let the others in does not mean necessarily that the court has taken the position that there is all the evidence that is required. That is a matter for you to determine, not this court."

■■■■ (5) Finally, as to the entire indictment, appellant urges that he was denied a fair and impartial trial by alleged prejudicial errors of the district court in examining him in an improper manner; in admonishing his attorney in the presence of the jury; and in making prejudicial statements, remarks and rulings throughout the trial.

The most serious of these strictures is that leveled against the district judge in his method of questioning the defendant. The judge asked him if he knew "any reason why Claramunt would come in here and make a statement on the stand," or why he would be "mad" at the defendant "to come in here and lie like that." Appellant answered: "Because he didn't believe me at the time I told him I didn't have any beef, my quota was exhausted."

The Judge pressed his examination of the witness further: "You mean to say you think they came in here because they tried to get beef from you and you wouldn't give it to them? A. That is right.

"Q. You did give it to them, didn't you? A. They knew I had a slaughter-house down there and they thought I was selling out of the slaughterhouse.

"Q. They are just mad at you? A. They are mad at me because I wouldn't give them any beef.

"Q. But you gave them beef? A. I offered it any time I had it.

"Q. You haven't testified that any time, any time at all, if they asked you for beef, and you didn't give it to them? A. Yes.

"Q. You never said that before, did you? All right. You say to this jury, these people have come in here and sworn before the jury to all these lies, and you say their reason is that because there were times when you couldn't give them any beef, and they didn't believe you? A. That is right.

"Mr. Comb: I take exception to those questions.

"The Court: I am getting at the truth of this matter. You can have all the exceptions you want.

"Mr. Comb: There is other reasons, too—

"The Court: Let him tell it. It is improper for you to tell your witness in advance what to say.

"Mr. Comb: I beg your pardon. I didn't tell him.

"The Court: You are telling him. I can cross-examine him, I have a right to do that.

"I know no other reason why these people would give such testimony against me.

"Q. All right. Now, you don't know of any other reason they would come in here and perjure themselves in this case? A. No.

"Mr. Comb: Exception.

"The Court: All right. Who else is there—All those men came in here, as I understand it, and you said you told them what you were going to charge them, and they had to pay a bonus? A. That is not true.

"Q. So the only reason you can think of why they would do that is because they are mad at you because they couldn't get the meat from you when you didn't have it? A. That is right.

"The Court: All right."

This, in our judgment, was not proper cross-examination by the court. No defendant should be compelled to call those who bear witness against him liars or perjurers, upon peril of implied acceptance of the truth of their testimony unless thus vigorously denied. Odious comparisons do not best serve court decorum, nor is truth more inherent in robust than in temperate language.

There can be no doubt, upon the whole record, that the able and conscientious district judge was zealous alone for the ascertainment of truth. No prejudice against the defendant is fairly imputable to him. But we deem it our duty to say that, in our judgment, his style of interrogation was far too vigorous in the instant case.

A district judge should constantly bear in mind that "the influence of the trial judge on the jury is necessarily and properly of great weight, and that his lightest word or intimation is received with deference, and may prove controlling." Starr v. United States, 153 U.S. 614, 626, 14 S.Ct. 919, 923, 38 L.Ed. 841. See also, opinion of Chief Justice Hughes in Quercia v. United States, 289 U.S. 466, 53 S.Ct. 698, 77 L.Ed. 1321.

In Frantz v. United States, 6 Cir., 62 F.2d 737, 739, this court said: "We do not intend to hold, or even to imply, that a federal judge may not participate directly in both civil and criminal trials, or propound such questions to witnesses as seem to him essential to the proper development of the case, or express his personal opinion upon fact issues, but in so doing he should always be calmly judicial, dispassionate, and impartial. He should sedulously avoid all appearance of advocacy as to those questions which are ultimately to be submitted to the jury. The definition of the duty of a trial judge, and the permissible limits of his action as such, are well stated by Judge Shelby in his opinion in Adler v. United States, 5 Cir., 182 F. 464, 472, which statement we accept and approve." In paragraphs of the opinion accepted and approved, the Fifth Circuit jurist said [p. 473] that "to avoid a compelling influence," the

views of the trial judge "should be stated with the circumspection and caution which should characterize all judicial utterances." It was pointed out that fundamentally and essentially, especially in criminal cases, the judge should avoid the appearance of advocacy; that should he undertake the cross-examination of the defendant and his witnesses in a hostile manner, "the impression would probably be produced on the minds of the jury that the judge was of the fixed opinion that the defendant was guilty and should be convicted;" and that a cross-examination, unobjectionable when conducted by the prosecuting attorney, "might unduly prejudice the defendant when it is conducted by the trial judge." The hesitation of defendant's counsel to make objections and to reserve exceptions to the judge's examination was assigned as a further reason for circumspection upon the part of the judge. Attorneys for the defendant in a criminal case naturally would desire not to be placed at the disadvantage of appearing to be in direct conflict with the court.

In the cases to which reference has been made, as well as in those to be commented upon presently, the trial court traveled in the direction of over-vigorous action, far beyond the limit of self-restraint exercised by the district judge in the case at bar. In DeGroot v. United States, 9 Cir., 78 F.2d 244, 249, the district judge went so far as to say of the most important corroborating defense witness in a murder case: "This witness has followed a steady course during the examination of trying to build herself up." In Withrow v. United States, 4 Cir., 1 F.2d 858, the judge charged the defendant's attorney with having made his client swear to a lie. In Lau Lee v. United States, 9 Cir., 67 F.2d 156 the trial judge stated that the attorney for the defendant was untruthful, not straightforward and honest with the jurors, and had intentionally misled them. In all three of these cases, the remarks of the judge were made in the presence and hearing of the jury.

In Quercia v. United States, 289 U.S. 466, 468, 53 S.Ct. 698, 77 L.Ed. 1321, supra, the district judge charged the jury, touching the defendant's testimony, thus: "You may have noticed, Mr. Foreman and gentlemen, that he wiped his hands during his testimony. It is rather a curious thing, but that is almost always an indication of lying. Why it should be so we don't know, but that is the fact. I think that every single word that man said, except when he agreed with the Government's testimony, was a lie."

A reading of the charge condemned in Starr v. United States, 153 U.S. 614, 14 S. Ct. 919, 38 L.Ed. 841, supra, would impress even a callous reader that it was more a tirade than a charge. See especially the warming-up language, beginning on page 628 of 153 U.S., 14 S.Ct. on page 924: "How unjust, how cruel, what a mockery, what a sham, what a bloody crime," et seq.

No statement or ruling of the district judge in the instant case is remotely comparable to those utterances which brought about reversals of convictions in the cases to which we have alluded.

In United States v. Breen, 2 Cir., 96 F.2d 782, 784, it was argued, as in the case at bar, that there was prejudicial error in the action of the district court in asking the defendant whether several witnesses, who had testified in contravention of his own statement, had testified falsely. The defendant replied that they had. The judgment of conviction was affirmed. The words of Judge Chase in that case seem applicable here: "The rather severe criticism in the appellant's brief of the conduct of the judge during the trial is unwarranted. He did examine witnesses at some length and perhaps was too active at that to be really helpful but that is far from saying that he did anything which prejudiced the appellants. He had the right to examine witnesses. Hargrove v. United States, 8 Cir., 25 F.2d 258. [Frequently], appellants like these become overcritical of a trial judge after conviction and on appeal seek to try him instead of the merits or demerits of their cause. See Goldstein v. United States, 8 Cir., 63 F.2d 609." In the case cited from the Eighth Circuit are collated cases where judgments were reversed for remarks of the trial court as constituting prejudicial error; and also cases where remarks of the court were held not prejudicial. See 63 F.2d 609, 613, 614. Consult, also, another illustrative case in which a conviction was upheld, notwithstanding the argument that the trial court committed prejudicial error in cross-examining the defendant: United States v. Gross, 7 Cir., 103 F.2d 11, 13.

In Magen v. United States, 2 Cir., 24 F. 2d 325, 327 a conviction was affirmed where the trial judge had been so provoked by a long, irritating colloquy with defend-

ant's attorney as to exclaim: "But is the government to be condemned and sent to hell because he may be on trial?" In affirming, the Court of Appeals declared that the proof of guilt was substantially uncontradicted and the reliance of the defense was on points of law rather than on the facts. In the case before us on this appeal, the defendant took the stand and denied the truth of the testimony of the accusing witnesses; nevertheless, the jury accepted their testimony as true. There is abundant substantial evidence, both direct and circumstantial, to sustain the verdict.

(6) The contention of the appellant Garber that he was denied a fair and impartial trial by other alleged prejudicial remarks, statements and rulings of the district court has been carefully considered upon the full record, with the resultant conclusion that the complaint is unjustified and possesses insufficient merit to warrant the setting up of straw men merely to strike them down. We have discussed, in detail, the only reasonably debatable assignment in this group of assignments of error. The combativeness of the defendant's counsel perhaps led the court into too much colloquy with them, but not to the defendant's prejudice. The attitude of the trial judge was conscientious; and he committed no reversible error. Compare Gridley v. United States, 6 Cir., 44 F.2d 716, 735, 737, 738.

The jury was cautioned in the charge:

"The fact that during the progress of the trial I have overruled certain objections or motions made by counsel for the defendant is not to be considered by you in any respect in your deliberations in determining the guilt or innocence of the defendants or any of them. Nor should the rulings which I have made be taken by you as an indication that the court has or intended to indicate any opinion thereby respecting the guilt or innocence of these defendants * * * a counsel should not be penalized by the jury for making objections, no matter how many he may make nor how frivolous you might think they are. You as members of the jury, have a function which is separate and distinct. Your duties make you the sole and exclusive judges of the facts and you are also judges of the credibility of the witnesses and of the testimony given by them. * * * Now, the Court is permitted, in a criminal case in a Federal court, to say to this jury what he believes as to any testimony that may have been given. So far I have never done that. At least, I can't remember a case where I ever told the jury what my opinion may be. I don't intend to do it in this case. If, during the course of this trial you may have felt that I have spoken sharply to one witness or another, or to one counsel or another, and that it seemingly has all the balance on one side or the other, don't draw any conclusions from that. Nor if you think that you have seen some facial expression on the part of this Court or some remark on the part of this Court as to how he felt, how the Court felt, one way or the other; that is not to be considered by you. You are the judges of the facts. You have got to sleep with your own conscience. Even if this Court expressed an opinion to you, that wouldn't be binding. You could arrive at your own conclusion."

The charge, as a whole, was specific and adequate in the protection of the defendant's rights. The punishment imposed was lenient; the prison sentences pronounced being suspended upon condition that the fines assessed should be paid. The record discloses no vindictiveness toward the defendant in the speech or action of the able district judge. The appellant's day in court was a day of fair trial.

The judgment of conviction and sentence is accordingly affirmed.