## UNITED STATES v. MANTON et al.
### No. 111.

Circuit Court of Appeals, Second Circuit.
Dec. 4, 1938.

**836**

John E. Mack, of Poughkeepsie, N. Y. (William E. Leahy and Wm. J. Hughes, Jr., both of Washington, D. C., and E. Donald Wilson, of New York City, of counsel), for appellant Manton.

Harry E. Ratner, of New York City, (John J. Sweedler, of New York City, of counsel), for appellant George M. Spector.

John T. Cahill, U. S. Atty., of New York City (Mathias F. Correa, Frank H. Gordon, Silvio J. Mollo, and Robert L. Werner, Asst. U. S. Attys., all of New York City, of counsel), for the United States.

Before STONE and SUTHERLAND, Circuit Justices, and CLARK, Circuit Judge.

SUTHERLAND, Circuit Justice.

This is an appeal from a judgment in pursuance of a verdict of conviction upon an indictment charging the above named defendants, together with William J. Fallon, John L. Lotsch, and Forrest W. Davis, with a conspiracy to obstruct the administration of justice and to defraud the United States. The statutes to be considered in connection with the indictment are §§ 88

and 241, Title 18, U.S.Code, 18 U.S.C.A. §§ 88, 241, printed in the margin.[1] Each of the three defendants last named pleaded guilty.

The indictment names as defendants Manton, Spector, Fallon, Lotsch and Davis, and alleges that they, together with Archie M. Andrews, now deceased, Alfred F. Reilly and Almon B. Hall, and divers other persons to the grand jurors unknown, conspired to commit offenses against the United States, to wit: corruptly to endeavor to influence, obstruct and impede the due administration of justice in suits pending before certain courts of the United States; and to defraud the United States of and concerning its right to have the lawful functions of the judicial power of the United States exercised and administered free from unlawful impairment and obstruction, and more particularly its right to the conscientious, faithful, disinterested and unbiased judgment and action of the defendant Manton as the Senior Circuit Judge of the United States Circuit Court of Appeals for the Second Circuit free from corruption, partiality, improper influence, bias, dishonesty and fraud.

The indictment further alleges that Manton was a stockholder in, or wholly or substantially owned or controlled, a number of corporations, some of which are named; that Fallon was an intimate acquaintance of Manton; that the conspirators knew that certain cases would be, during the course of the conspiracy, pending in and before the Circuit Court of Appeals for the Second Circuit and certain district courts; that several cases, named and described, were pending from time to time in these courts between the years 1930 and 1939, in the decision of which Manton participated; that it was a part of the conspiracy that Fallon would hold himself out as intimately acquainted with Manton and would represent to litigants and parties interested in these and other cases that, by reason of such association and intimacy, he could and would procure action favorable to such litigants and parties; that Fallon would seek out litigants and parties interested in these cases and would be sought by them for the purpose of having Fallon procure such action, in virtue of Manton's office, position, power and influence; that Manton would accept and receive and agree to accept and receive sums of money as gifts, loans and purported loans in return for such action, and would corruptly act in each of these cases without regard to the merits.

The indictment sets forth, and alleges the particulars of, twenty-eight distinct overt acts committed in pursuance of the conspiracy and participated in by Manton and one or more of the other conspirators.

Manton demurred to the indictment and entered a motion to quash on the grounds: (1) that the indictment charged not one single conspiracy but a number of separate and distinct conspiracies in one count, (2) that the indictment did not state an offense, (3) that more than one crime was charged in the indictment. Both the demurrer and motion to quash were overruled.

The case was tried before the district court and a jury and resulted in a verdict of conviction against both appellants, upon which final judgments were rendered imposing imprisonment and fine. From these judgments appellants have separately appealed to this court. The cases have been separately presented, and we shall separately consider them.

---

[1] § 88. "If two or more persons conspire either to commit any offense against the United States, or to defraud the United States in any manner or for any purpose, and one or more of such parties do any act to effect the object of the conspiracy, each of the parties to such conspiracy shall be fined not more than $10,000, or imprisoned not more than two years, or both."

§ 241. "Whoever corruptly, or by threats or force, or by any threatening letter or communication, shall endeavor to influence, intimidate, or impede any witness, in any court of the United States or before any United States commissioner or officer acting as such commissioner, or any grand or petit juror, or officer in or of any court of the United States, or officer who may be serving at any examination or other proceeding before any United States commissioner or officer acting as such commissioner, in the discharge of his duty, *or who corruptly* or by threats or force, or by any threatening letter or communication, *shall influence, obstruct, or impede, or endeavor to influence, obstruct, or impede, the due administration of justice therein*, shall be fined not more than $1,000, or imprisoned not more than one year, or both." (Italics added.)

## The Case of Manton.

The appellant Manton assails the judgment upon several grounds, which, so far as necessary to be considered, may be epitomized as follows:

1. That the court erred in overruling the demurrer to the indictment and motion to quash;

2. That the evidence fails to connect him with any conspiracy and the court erred in refusing his request to instruct the jury to acquit;

3. That his motions to strike out testimony of certain witnesses were erroneously denied; and that evidence was improperly admitted against his objection;

4. That his cross-examination upon collateral matters was so unfairly conducted as to require a reversal;

5. That the court erred in refusing certain requests to charge the jury and in respect of some instructions actually given;

6. That the conduct of the trial and the charge to the jury were so hostile and unfair as to require a reversal.

■ *First.* Manton's contention is that the indictment sets forth in one count a number of distinct conspiracies; that is to say, that the allegations in respect of each of the suits set forth a separate and distinct conspiracy. But this confuses the conspiracy, which was one, with its aims, which were many. The indictment charges a general conspiracy, continuous in operation and single in character, having relation to no particular litigation, but constituting an agreement between Manton and Fallon by the terms of which, without limit as to time, Fallon was to seek out litigants and parties, whether then known or unknown, who were interested in suits, then or thereafter pending, and, in effect, represent to each of them that Manton would accept sums of money in return for corrupt judicial action by him favorable to the interests of those who paid. In short, the conspiracy to obstruct the administration of justice and to defraud the United States was to be consummated by sale of judicial action to all willing to pay the price. That this was a single continuing offense and not a number of distinct offenses is settled by numerous decisions.

Harvey v. United States, 2 Cir., 23 F.2d 561, presented a similar situation. There, in a single count, the indictment charged defendants, who were prohibition agents, with having conspired together and with other persons to obtain evidence of violations of the National Prohibition Act in order to seek and to receive bribes to influence their official acts. Evidence having been admitted of several distinct acts of the kind covered by the conspiracy, it was contended that this amounted to the admission of evidence of distinct conspiracies; but the court held the evidence to be proper, saying that it was competent to prove several offenses committed by the conspirators pursuant to their general criminal scheme.

■ The conspiracy constitutes the offense irrespective of the number or variety of objects which the conspiracy seeks to attain, or whether any of the ultimate objects be attained or not. Williamson v. United States, 207 U.S. 425, 28 S.Ct. 163, 52 L.Ed. 278. Mr. Justice White, speaking for the Court in that case, concisely stated the rule, by saying (207 U.S. page 447, 28 S.Ct. page 170, 52 L.Ed. 278): "The conspiracy is the offense which the statute defines, without reference to whether the crime which the conspirators have conspired to commit is consummated." The indictment in that case charged that the defendants had conspired to suborn a large number of persons to commit perjury in proceedings for the purchase of public lands. The indictment was held good, although the persons to be suborned were not stated or the times or places particularized. It was not essential, the Court said, that these particulars should have been agreed upon since the criminality of the conspiracy charged consisted in the unlawful agreement to compass a criminal purpose.

■ The offense becomes complete when the agreement is made. The only effect of the requirement that an overt act shall be shown is to permit an abandonment of the conspiracy in the meantime and the consequent avoidance of the penalty which the statute imposes. "This offense does not consist of both the conspiracy and the acts done to effect the object of the conspiracy, but of the conspiracy alone. The provision of the statute, that there must be an act done to effect the object of the conspiracy, merely affords a locus pœnitentiæ, so that before the act done either one or all of the parties may abandon their design, and thus avoid the penalty prescribed by the statute." United States v. Britton, 108 U.S. 199, 204, 205, 2 S.Ct. 531, 534, 27 L.Ed. 698.

United States v. Kissel, 218 U.S. 601, 607, 31 S.Ct. 124, 54 L.Ed. 1168, distinctly recognizes the rule that a conspiracy exists as soon as the agreement is made but may continue beyond the time of making it. "But when the plot contemplates", the Court said (218 U.S. page 607, 31 S.Ct. page 126, 54 L.Ed. 1168) "bringing to pass a continuous result that will not continue without the continuous co-operation of the conspirators to keep it up, and there is such continuous co-operation, it is a perversion of natural thought and of natural language to call such continuous co-operation a cinematographic series of distinct conspiracies, rather than to call it a single one." And again (218 U.S. page 608, 31 S.Ct. page 126, 54 L.Ed. 1168): "A conspiracy is constituted by an agreement, it is true, but it is the result of the agreement, rather than the agreement itself, just as a partnership, although constituted by a contract, is not the contract, but is a result of it. The contract is instantaneous, the partnership may endure as one and the same partnership for years. A conspiracy is a partnership in criminal purposes. That as such it may have continuation in time is shown by the rule that an overt act of one partner may be the act of all without any new agreement specifically directed to that act."

■■ Nor, contrary to Manton's contention, is the indictment bad for duplicity because it alleges that the conspiracy contemplated the violation of a criminal statute and also the defrauding of the United States. ·While there are some decisions which seem to lend support to the contention, the Supreme Court of the United States has held otherwise, and by its decision, of course, we are bound. Frohwerk v. United States, 249 U.S. 204, 210, 39 S. Ct. 249, 252, 63 L.Ed. 561. "The conspiracy", the Court there said, "is the crime, and that is one, however diverse its objects." See also Magon v. United States, 9 Cir., 260 F. 811, 813; Anderson v. United States, 9 Cir., 269 F. 65, 76.

■ It is further urged that the indictment charges, and that the government sought to prove, a conspiracy to accept and secure bribes, and that this is not an indictable conspiracy. We do not stop to inquire whether in the present case the conclusion would follow from the premises, since it is clear that the premises are not true. Perhaps this sufficiently appears from what we have already said; but we add a few words at this point which, at least, may be useful by way of emphasis. The indictment does not charge as a substantive offense the giving or receiving of bribes; nor does it charge a conspiracy to give or accept bribes. It charges a conspiracy to obstruct justice and defraud the United States, the scheme of resorting to bribery being averred only to be a way of consummating the conspiracy and which, like the use of a gun to effect a conspiracy to murder, is purely ancillary to the substantive offense. The long argument upon the point consequently fails for lack of foundation to give it support.

. Second. The testimony clearly establishes the making of a large number of payments to Fallon by or in the interest of . litigants with the understanding that the moneys would be transferred in the form of gifts or loans to the defendant Manton or to corporations which he owned or controlled or in which he was interested, in return for corrupt favorable action on his part in the decision of the several suits and controversies named in the indictment and others not named. Proof of acts to effect the object of the conspiracy alleged in respect of each of these suits and controversies is full and ample; and the only question which requires consideration is whether Manton was in fact a party to a conspiracy which indubitably these acts were calculated to effect.

■ It is not necessary that the participation of the accused should be shown by direct evidence. The connection may be inferred from such facts and circumstances in evidence as legitimately tend to sustain that inference. Indeed, often if not generally, direct proof of a criminal conspiracy is not available and it will be disclosed only by a development and collocation of circumstances. In passing upon the sufficiency of the proof, it is not our province to weigh the evidence or to determine the credibility of witnesses. We must take that view of the evidence most favorable to the government and sustain the verdict of the jury if there be substantial evidence to support it. Hodge v. United States, 6 Cir., 13 F.2d 596; Fitzgerald v. United States, 6 Cir., 29 F.2d 881.

■ A careful reading of the record in the light of these principles satisfies us that the verdict of the jury must be upheld. It is not necessary to recount the evidence at length. It is enough to say

that the jury could have found, and, in support of their verdict we may properly assume, did find, the following:

1. Fallon and Manton had been on friendly terms and in frequent contact for many years. Fallon had procured moneys with the understanding that they were to be paid to Manton or loaned to companies in which Manton was interested by or for the benefit of parties to the several cases named in the indictment. Fallon had personally introduced to Manton some of these parties or their agents or attorneys. Fallon had been in contact with one or more persons connected with or interested in each of the cases, had held himself out to them as willing and able to buy Manton's favorable offices, and had secured payments for that avowed purpose. Indeed, Fallon's constant intermediation and his activities in connection with all cases involved in the charge of conspiracy is a most pertinent and significant fact tending to establish the singleness of purpose and the unbroken continuity of the conspiracy.

2. The first of the suits involved in the conspiracy, the Art Metal Works case, was begun in 1932, the defense being assumed by the Evans Case Company. Reilly, president of the company, was one of the conspirators. He advised with Fallon about the case on a number of occasions. He gave Fallon, at the latter's request, many sums of money aggregating thousands of dollars and for several years carried him on the payroll of the Evans Case Company at $100 per week and paid him other sums, the whole amounting to nearly $20,000. The district court, having decided the case against the Evans Case Company, the company appealed. In another case decided in its favor an appeal was taken by the losing party. After some negotiations between Reilly and Fallon, the former expressed a willingness to pay $25,000 upon Fallon's assurance of favorable action by Manton on the appeal, $15,000 to go to Manton as a loan. At a later time, Reilly was informed by Fallon by telephone that he had learned that the decision would be favorable and "that the Judge [Manton] was in bad circumstances for the money and wanted to know if I could not get $10,000 as quickly as possible." About the same time, decisions favorable to the Evans Case Company were handed down, the opinions being rendered by Manton. Reilly then paid Fallon $10,000 in cash and also gave him three $500 checks. The $10,000 was entered in the books of the Evans Case Company as "Prepaid Royalties, Air-Flow". Subsequently, on motion of Reilly, the board of directors of the company directed that the item be transferred to the "legal and professional account for litigation expense."

During the summer of 1934, Reilly was introduced by Fallon to Manton, and thereafter Reilly, Manton and Fallon played golf together, and Reilly lunched with Manton at the Lawyers Club and went out with Manton and his wife, Fallon at times being present. In February 1939, Manton resigned his office. A day or two before the resignation was to take effect Manton called Reilly on the long-distance telephone and told him he understood that he had Bill (meaning Fallon) on the payroll. Receiving an affirmative reply, Manton said: "That will be very embarrassing for me if found out, because I heard they intend to investigate". Manton then said: "Couldn't you pull out those pages?" Reilly answered he knew nothing about bookkeeping and would not know where to begin. Manton repeated that it would be very embarrassing for him and Reilly responded: "I don't know what to do about it."

After the lapse of a few hours, Reilly had another long-distance telephone talk with Manton, first asking him if it was all right to talk. Manton answered: "I don't think exactly." Manton then asked Reilly for his telephone number and said that he would call him back under another name. Later in the same day, the call was made, and the former conversation was repeated in substance. In the course of this conversation, Manton spoke of the statute of limitations and said that it would protect them in the Art Metal investigation; that anything that was three years old was outlawed. Manton again spoke of Fallon being carried on the payroll, saying that it was a great embarrassment to him and to get rid of the records because of the Art Metal investigation. Manton admitted that telephone conversations between himself and Reilly occurred, and that he initiated them, but gave a different version of what was said.

A few days later, Reilly directed the bookkeeper to procure all the records and to destroy them. The bookkeeper destroyed the records of the company up to 1935 —cashbooks, ledgers, bills, vouchers and everything with the exception of some

papers subsequently discovered and turned over to the Government.

3. In the year 1934, an appeal was taken from the decision of the district court in Smith v. Hall, a patent infringement case. More than a million dollars was involved. Hall was introduced by Forrest W. Davis, one of the defendants named in the indictment, to Fallon as one who, Davis had advised, could help him in the litigation. Hall told Fallon of the litigation and was asked by Fallon for copies of the decision, briefs and record so that he might show them to Manton. At a later meeting, Fallon reported that Manton after a conference had said that for $75,000 a decision in Hall's favor could be obtained. It was finally agreed that the amount should be reduced to $60,000. A check was given for $5,000 on account. So far, there is no direct evidence connecting Manton with this transaction. But later along, Hall, being dissatisfied with the situation, Fallon agreed to obtain Manton's note, and upon that basis a second check for $5,000 was given, and thereafter Hall received a note signed by Manton payable to Davis for $5,000. Other payments from time to time were made to Fallon, the final amount to complete the payment of the $60,000 being made after a decision in Hall's favor was handed down by Judge Manton. In the summer of 1938, after the beginning of an official investigation respecting Manton, Davis, who theretofore had never met Manton, received a telephone call from him in response to which Davis called on Manton at the latter's residence. Manton asked him whether he, Davis, had lent any money to Manton. Davis replied that he had not. Here again, Manton admitted the conversation, but gave a different version of it.

4. Three other cases involved in the conspiracy conveniently may be considered together. Two of them, Electric Autolite Company v. P. & D. Manufacturing Company, and General Motors Corporation v. Preferred Electric & Wire Corporation were patent cases. The third was a criminal prosecution against John L. Lotsch.

Lotsch was a patent attorney and with other counsel represented the defendants in the patent cases. The district court had decided both cases against Lotsch's clients, and both were reversed on appeal. Pending the appeal, Lotsch was introduced to Fallon who asked Lotsch whether he could secure loans for Manton

from a bank in which Lotsch was an officer, and told him that if he could obtain them he would introduce Lotsch to Manton. Lotsch was then introduced to Manton, and he and Manton agreed that loans in the sum of $25,000 would be obtained. The loans were made, $10,000 at once and $15,000 a short time later. Thereafter, the Electric Autolite case was decided in favor of Lotsch's client, Manton handing down the opinion.

In the General Motors case, Lotsch, seeking a stay which had been denied by the lower court, applied to Manton who issued an order to show cause and, after argument, granted the stay. On the day of the argument, Manton requested of Lotsch an additional loan of $25,000, which was made, but in the name of Sullivan, president of a company which Manton controlled. The loan was guaranteed by Manton who also furnished collateral as security. When the loan was made, Sullivan drew his check for the full amount payable to himself which he then indorsed in blank and which, after being certified by the bank, was handed to Manton. Manton had asked that the check be made to his own order, but Lotsch suggested that the course which was followed would be better, since the check could then be dealt with by Manton and no one would know for whom it was made. The check was indorsed by Manton and deposited to the credit of The Financial Corporation.

In an opinion by Manton, the decree in the General Motors case was reversed. A short time thereafter, Sullivan having died, Manton executed a new note, and the loan was transferred to him and Sullivan's note released.

In December, 1935, Lotsch was indicted, in a district court sitting in the second circuit, for taking a bribe. He discussed the matter with Manton. In February following, the case was assigned to Judge Thomas and set for trial. Manton told Lotsch that he had arranged to see Thomas and subsequently reported to Lotsch that he had seen Thomas who would take care of the case for $10,000 paid before trial. Lotsch borrowed the money and paid it to Manton in two sums of $5,000 each. There is no proof that Thomas, who was not called as a witness, received any part of the money.

At the trial, Thomas granted Lotsch's motion for a directed verdict of acquittal. Thereupon, Lotsch was discharged but

immediately rearrested on a charge of extorting money under color of office. Lotsch sought out Judge Manton who expressed the opinion that the charge presented a case of double jeopardy. At this conversation Manton gave Lotsch a copy of the government's trial brief in the earlier case which Thomas had handed Manton. Lotsch was indicted upon the charge and sued out a writ of habeas corpus, which was argued before a district judge who dismissed the writ. From this action Lotsch appealed. The appeal was heard by the appellate court, Manton presiding. The court reversed the district court and directed that the indictment be dismissed. Following the argument, and before the decision, Lotsch discussed the case with Manton who suggested that a reply brief be filed with respect to a certain point that had been raised. A reply brief was subsequently filed and thereupon, and before the decision of the case, Manton telephoned Lotsch to meet him on a designated Long Island train. The meeting took place in a parlor car, and Manton showed Lotsch a draft of the proposed opinion of the court, which Lotsch read. After reading it, Lotsch suggested the elimination of certain things which he thought objectionable; and Manton accepted two of the suggestions. Lotsch also objected to a criticism directed against Judge Thomas, but Manton told him that could not be taken out because his colleagues would not stand for it. Thereafter, a decision in Lotsch's favor was handed down.

In the summer of 1937, Lotsch was prosecuted for still another offense. He was convicted in 1938 and appealed from the judgment. He showed the record to Manton and discussed it with him. Manton told him that the case would be reversed when reached because of certain errors committed at the trial. In August, 1938, at Manton's request, Lotsch met Manton and had a conversation with him at the latter's home on Long Island. Manton told him that State District Attorney Dewey was making an investigation in connection with the Sullivan matter and that Manton understood Dewey was looking for Lotsch with a view of having him subpoenaed. He suggested that Lotsch go away until the matter blew over. In pursuance of the suggestion, Lotsch went into Connecticut where he stayed with his daughter for two weeks.

In February, 1939, just after Manton's resignation, he and Lotsch again met at an office in New York. Manton there suggested that Lotsch see the acting United States District Attorney and tell him that a certain loan that had been mentioned by Dewey in a public letter, and other loans, were regular business transactions. During the same month Lotsch informed Manton that the fact that he, Lotsch, had borrowed $10,000 had been disclosed; whereupon Manton told Lotsch that that matter in connection with Judge Thomas, he should carry to his grave and, if asked about it before the grand jury, he should say that he paid the $10,000 to Judge Millard, an attorney then deceased—"Judge Millard is dead and no one can testify against him." Manton suggested that Lotsch go into Connecticut again, but Lotsch being without funds, Manton gave him the name of a person from whom he might borrow the necessary amount. In that or a later conversation, Manton inquired when the Thomas payment was made and being informed said that the statute of limitations would outlaw that. Manton admitted having conversations with Lotsch, but denied Lotsch's version of them.

5. In 1936, suit was brought in the district court by Schick Industries against Dictograph Products Company, Inc. It was a patent infringement case involving the claim of the Schick razor against the Packard razor. The district court had entered an interlocutory decree and appointed a special master and required the Dictograph Company to furnish a $50,000 bond. Archie Andrews held the principal interest in the Dictograph Company and apparently felt much disturbed by the action of the district court. He was introduced to Morris Renkoff, told him of his trouble and was informed by Renkoff that he could help if the case came to the appellate court because he had a man who could "fix things up". With Andrews' authority to do so, Renkoff then saw Fallon who promised to take the matter up with Manton. Shortly thereafter, Fallon reported to Renkoff that he had seen Manton and that the case would be taken care of for $50,000, provided that an attorney named Weisman were employed by Andrews. Andrews thought the amount too high and suggested $25,000. After Fallon had been told, he reported that he had seen Manton and that the amount would be acceptable. It was then agreed between Fallon, Renkoff and Andrews that $10,000 would be paid at once and the balance after a fa-

43

vorable decision. The $10,000 was paid to Fallon, part of it being a loan from Renkoff. A written statement signed by Renkoff and delivered to Andrews acknowledged the receipt of the $10,000 for the purpose of purchasing Dictograph Products Company stock. The amount was paid to Fallon in cash, and Fallon left, ostensibly to pay the amount to Manton. In the course of an hour Fallon returned and told Renkoff: "Everything is O K. You can go and tell Archie Andrews that he is going to get the decision in his favor. There will be a bond of $25,000 and no man in the business". The evidence does not show whether the $25,000, or any part of it, was in fact received by Manton.

In 1936, Renkoff had been convicted of a criminal offense and sentenced to imprisonment. The judgment was affirmed and thereafter Andrews enlisted the assistance of Spector, to whom he made a number of payments amounting in the aggregate to a very large sum. These payments began while the appeal was pending in the Schick case and were completed either before or immediately after its final determination. Following these payments, Spector turned over equivalent sums in the form of loans to the National Cellulose Company in which Manton held a large interest. Other sums similarly received he also turned over, in the form of loans aggregating more than $20,000 to Manton's confidential and official secretary who was an officer of a corporation in which Manton likewise had a large interest. We shall discuss, in further detail, these devious proceedings when we come to deal with the case of Spector.

On December 2, 1936, Manton ordered that the Schick case be set for argument on January 4, 1937. The schedule of the court showed that Manton was to sit on that day. Counsel for the Schick company, having noted that fact and that Manton was not to sit on January 11th, secured an agreement with opposing counsel to postpone the argument until the latter date; and Manton entered an order accordingly. Subsequently, the schedule was changed so that Manton would sit on January 11th. A further postponement was sought, and counsel on both sides appeared before Manton in chambers for argument on the request. Counsel for the Schick company, before appearing, examined the assignment of judges with a view of selecting an adjourned date. They selected February 11th, a date when Manton was

not to sit. On the argument, Manton suggested February 4th, a day on which he was scheduled to sit, but counsel for both parties after conferring agreed upon February 11th. Manton, putting this agreement aside, said: "This case will be argued on February 4th." And the case was argued on that day, Manton presiding. The decision was against the Schick Company, Manton concurring in the opinion with another judge, the third judge dissenting.

In the foregoing recital of facts and circumstances, to which others less significant might be added, we have set forth some matters with respect to which Manton's immediate connection is not shown by the evidence. And we have done so because of the light they shed upon the relevant evidence in respect of Manton's partnership in the conspiracy and the aid they furnish toward a better understanding of that matter. But in considering the contention that the court erred in submitting to the jury the initial question whether Manton was a party to the conspiracy, we have put these facts and circumstances aside. Of course, Manton's partnership in the conspiracy being settled prima facie, these matters become relevant as acts and declarations of co-conspirators in the execution of the conspiracy, by which Manton would be bound.

It is true that Manton denied all incriminating testimony, and that, in the main, the evidence tending to show Manton's partnership in the conspiracy came from the lips of convicted co-conspirators and other witnesses of bad or dubious character. Indeed, in a case like this, it is unlikely that it would be otherwise. But the credibility of these witnesses and the weight to be given their testimony, as we have already said, were questions for the jury and are matters beyond the scope of judicial review. Moreover, the record contains a mass of documentary evidence—accounts, cancelled checks, promissory notes, etc.—not only corroborative of the oral testimony, but adding independent strength to the government's case.

We deem it unnecessary to comment further upon the evidence. It is enough to say that, if believed by the jury, as we may properly assume it was, it discloses a state of affairs so plainly at variance with the claim of Manton's innocence as to make the verdict of the jury unassailable. The circumstances taken altogether amply

sustain that conclusion. Among these circumstances the following are especially significant: (a) The long and friendly relations between Fallon and Manton. (b) The employment of Fallon in obtaining loans for the Manton corporations. (c) The apparently gratuitous introduction by Fallon to Manton of persons interested in cases while they were under consideration or pending. (d) Lotsch's testimony that after being introduced by Fallon he paid to Manton $10,000 ostensibly for the corruption of Judge Thomas, received from Manton a trial brief of the government in that case, consulted with him about the language of an opinion before it was handed. down, was advised to leave New York because of an investigation then in progress or threatened, was admonished to keep secret the Thomas matter, and that Manton, after being told, upon inquiry by him, the date when a particular transaction had occurred, said it was barred by the statute of limitations. (e) Manton's relations with Reilly, their telephone conversations, in which Manton expressed anxiety about Fallon's being carried on the payroll because of a pending investigation, Manton's suggestion that the circumstance would be embarrassing to him and that the record pages relating to the matter should be pulled out, that certain records be destroyed because of the Art Metal investigation, and that the statute of limitations would protect them in that investigation. (f) The manipulation of the schedule of assignments of judges to enable Manton to sit in the Schick case. (g) The loans made at Manton's request by or through the intervention of persons interested in some of the cases during their pendency, one of the most significant of these being the loan of $25,000 made in the name of Sullivan by Lotsch to Manton at the latter's solicitation on the very day of the argument in the General Motors case, the proceeds of which were immediately handed by Sullivan to Manton, a method adopted to conceal Manton's connection with the transaction. Similar technique appears in respect of the loans made by Andrews to or for corporations in which Manton was interested through Spector as a conduit, the details in respect of which will more fully appear when we come to consider the case of Spector.

*Third.* It is contended that the trial court committed many errors against appellant in receiving and in refusing to strike out evidence. Some of the claims of error so clearly are without merit that we put them aside at once. Others we consider.

■ Motions made to strike out testimony as to statements made by Fallon in Manton's absence it is urged should have been granted. This evidence was offered and received before it was shown that Manton was a party to the conspiracy, the objection to the testimony going only to the order of proof; and so viewed the point falls for want of merit, for the rule has been so long established as to be elementary that the order of proof is a matter addressed to the discretion of the trial court. We are unable to find that this discretion was abused in any of the instances mentioned in the brief.

■ It is urged that testimony in respect of the Lotsch trial before Judge Thomas was improperly received. The ground advanced is that the case was in a district court while the indictment related only to proceedings in the Circuit Court of Appeals. This is clearly incorrect. The indictment specifically mentions this particular case as having been duly brought in the United States District Court for the Southern District of New York and includes that court and this case by general words of description as being within the purview of the conspiracy.

■ The trial court over objection admitted in evidence what are called recordak facsimiles of checks. The objection made to this ruling of the court is that such facsimiles do not constitute the best evidence. These recordaks are photostatic reproductions of the face of checks which have been paid; and they were offered as evidence of such payments. It is argued that the original checks themselves were the best evidence and that their absence should have been accounted for as a prerequisite to the admission of the recordaks. With this contention we cannot agree. These recordaks are made and kept among the records of many banks in due course of business and are within the words of 28 U.S.C. § 695, 28 U.S.C.A. § 695.[2] Their accuracy is not questioned. They repre-

---

2 "In any court of the United States and in any court established by Act of Congress, any writing or record, whether in the form of an entry in a book or otherwise, made as a memorandum or record of any act, transaction, occurrence, or event, shall be admissible as evidence of said act, transaction, occur-

sent, in the course of a year, perhaps millions of transactions. No one at all familiar with bank routine would hesitate to accept them as practically conclusive evidence. As proof of payment, they constitute not secondary but primary evidence.

■ But putting all this aside, the best evidence rule should not be pushed beyond the reason upon which it rests. It should be "so applied", as the Supreme Court held in an early case, "as to promote the ends of justice, and guard against fraud or imposition." Renner v. Bank of Columbia, 9 Wheat. 581, 597, 6 L.Ed. 166. See also United States v. Reyburn, 6 Pet. 352, 366, 8 L.Ed. 424; Minor v. Tillotson, 7 Pet. 99, 100, 8 L.Ed. 621. The rule is not based upon the view that the so-called secondary evidence is not competent, since, if the best evidence is shown to be unobtainable, secondary evidence at once becomes admissible. And if it appear, as it does here, that what is called the secondary evidence is clearly equal in probative value to what is called the primary proof, and that fraud or imposition, reasonably, is not to be feared, the reason upon which the best evidence rule rests ceases, with the consequence that in that situation the rule itself must cease to be applicable, in consonance with the well established maxim—cessante ratione legis, cessat ipsa lex.

An over-technical and strained application of the best evidence rule serves only to hamper the inquiry without at all advancing the cause of truth. "The fundamental basis," the Supreme Court has said, "upon which all rules of evidence must rest—if they are to rest upon reason—is their adaptation to the successful development of the truth." Funk v. United States, 290 U.S. 371, 372, 381, 54 S.Ct. 212, 215, 78 L.Ed. 369. There is not the slightest reason to suspect that this fundamental basis was affected in the present instance.

■ Manton's brief contains a short, obscurely-placed paragraph complaining of the action of the court in admitting in evidence a carbon copy of a letter without accounting for the absence of the "original". While there is some conflict in the decisions, the better rule is that so-called original and carbon copies are duplicate originals; and that one is as much primary evidence as the other. See 2 Jones on Evidence (2d Ed.) § 798. They are made upon sheets of paper between which carbons have been interposed. The messages are impressed at the same time and by the same impact. To call one of them an original and the other a copy is simply to ignore the obvious.

■ *Fourth.* The attack upon the cross-examination in respect of collateral matters as being so unfair as to require a reversal may be quickly disposed of. The office of cross-examination is to test the truth of the statements of the witness made on direct; and to this end it may be exerted directly to break down the testimony in chief, to affect the credibility of the witness, or to show intent. The extent to which cross-examination upon collateral matters shall go is a matter peculiarly within the discretion of the trial judge. And his action will not be interfered with unless there has been upon his part a plain abuse of discretion. 3 Wharton's Criminal Evidence (11th Ed.) § 1308. See Alford v. United States, 282 U.S. 687, 694, 51 S. Ct. 218, 75 L.Ed. 624. We find no such case here. The cross-examination, whether upon collateral matters or not, while prolonged and searching, presents nothing which calls for interference by an appellate court. And the rulings might be equally defensible in some instances if the trial judge, in the exercise of his discretionary power, had ruled the other way. See Johnston v. Jones, 1 Black 209, 226, 17 L.Ed. 117. And in some instances, the rulings well might be criticized as restricting overmuch the government's right of cross-examination.

■ *Fifth.* The trial judge refused to charge the jury that they might consider the question whether the decisions here involved were correct. On Manton's behalf this is assailed as error on the ground that there could be no obstruction of justice unless the decisions were wrong and

---

rence, or event, if it shall appear that it was made in the regular course of any business, and that it was the regular course of such business to make such memorandum or record at the time of such act, transaction, occurrence, or event or within a reasonable time thereafter. All other circumstances of the making of such writing or record, including lack of personal knowledge by the entrant or maker, may be shown to affect its weight, but they shall not affect its admissibility. The term 'business' shall include business, profession, occupation, and calling of every kind."

that the jury should have been so told. There is nothing in the point.

The crime charged in the indictment became complete the instant the conspiracy was formed (provided only that there could be no prosecution unless followed by some overt act), whether the object of the conspiracy ever was consummated, or, if consummated, whether the result, considered apart, was conformable to law or the reverse. See Goldman v. United States, 245 U.S. 474, 476, 477, 38 S.Ct. 166, 62 L.Ed. 410. The conspiracy here contemplated the payment of money to induce a judge to exercise his judicial power in favor of the bribe-givers, without regard to the merits. If the decisions finally rendered in pursuance of the conspiracy be legally sound the fact is immaterial. The evidence here, indeed, does not forbid the inference that generally Manton refrained from agreeing to the final step except where the correctness of the decision to be rendered seemed to him to be fairly clear, and, in consequence, discovery and exposure less probable.

We cannot doubt that the other judges who sat in the various cases acted honestly and with pure motives in joining in the decisions. No breath of suspicion has been directed against any of them and justly none could be. And for aught that now appears we may assume for present purposes that all of the cases in which Manton's action is alleged to have been corruptly secured were in fact rightly decided. But the unlawfulness of the conspiracy here in question is in no degree dependent upon the indefensibility of the decisions which were rendered in consummating it. Judicial action, whether just or unjust, right or wrong, is not for sale; and if the rule shall ever be accepted that the correctness of judicial action *taken for a price* removes the stain of corruption and exonerates the judge, the event will mark the first step toward the abandonment of that imperative requisite of even-handed justice proclaimed by Chief Justice Marshall more than a century ago, that the judge must be "perfectly and completely independent with nothing to influence or control him but God and his conscience."

*Sixth.* We are unable to discover anything in the record which gives support to the contention that Manton was not given a fair trial or that the charge to the jury was hostile or unfair. On the contrary, the record plainly discloses the patience and fairness of the judge in dealing with the various questions which arose during the trial. We find it unnecessary to pursue the matter further, except as it relates to the requested instruction in respect of good character and the court's charge on the subject; and we pass to a consideration of that question.

Manton requested the district court to instruct the jury that evidence of good character is substantive evidence and that such evidence might alone raise in their minds a reasonable doubt of the defendant's guilt. The court in substance instructed the jury that the establishment of a good reputation was a fact to be considered by the jury and might in an otherwise doubtful case turn the scales in favor of the defendant; that it was not in itself a sufficient answer to a criminal charge but only one of the circumstances in evidence to be considered in determining whether guilt had been established beyond a reasonable doubt.

No exception was taken to the action of the court in failing to follow the language of the request or with respect to the charge itself on the subject. But this is not all. Fifty-eight assignments of error are made, among them several relating to refusals of the court to charge as requested and to specific parts of the charge as given. But, significantly, the assignment of errors ignores altogether the question of good character and, clearly, the default was intentional. The omissions contravene Rule 9 which requires that a party excepting to the charge shall state distinctly the several matters of law to which he excepts, and Rule 10 which requires that when the error claimed is to the charge, the assignments of error must set out the part challenged, whether it be to an instruction given or to a request refused. If these rules are to be respected, the question presented is not open to review.

It is true that Rule 10, as counsel belatedly suggests, permits the court, *at its option,* to notice a plain error though not assigned. But since the exercise of the power is optional, the circumstances must be such as to make the consideration of the point a legitimate exercise of discretion. The option should not be so exercised as to bring the primary substantive rules to naught by an arbitrary exercise of power.

At the conclusion of the charge, the judge stated to counsel that he would be

glad to hear any exceptions they desired to take to the charge. Manton's counsel directed the court's attention to several requests relating to matters other than character, and asked that these be given. The court gave one of them, declining to give the others. To each refusal counsel duly excepted. In respect of his request on the subject of good character, counsel asked that it be given "as requested exactly" and added: "I do not believe that your Honor did instruct the jury that it was their duty to acquit the defendant Manton if the evidence of good character entered in his favor raises a reasonable doubt in their minds." To this the court responded: "Of course, I so instructed them, but if you did not understand it that way, I would rather give them the instruction * * * [you] have than give you an exception on it. However, you want 38 [the good character request] given to them, do you?" Counsel said, "Yes", and the court responded, "Very well." The court then told the jury that he had been asked to emphasize a little more the effect of good reputation. After paraphrasing a part of what he had before said, the judge added that "evidence of good reputation is only one fact, like other facts, to be taken into consideration in weighing all the evidence in the case to determine whether there is a reasonable doubt, or whether there should be a verdict of acquittal or conviction."

Upon concluding his additional instructions, the court said: "I think I have covered them all," to which counsel for Manton responded: "I think you did, your Honor." The court then asked whether there were any other exceptions, to which there was no response.

▇▇▇ These colloquies between court and counsel make manifest the willingness of the trial judge to comply with the good character request. The primary purpose of Rule 9, and the essential function of the specific exceptions it requires, is to direct the mind of the trial judge to the precise point so that he may have fair opportunity to reconsider and change a ruling if so advised, and also to obviate injustice and mistrials due to inadvertent error. United States v. U. S. Fidelity & Guaranty Co., 236 U.S. 512, 529, 35 S.Ct. 298, 59 L.Ed. 696; Fillippon v. Albion Vein Slate Co., 250 U.S. 76, 82, 39 S.Ct. 435, 63 L.Ed. 853.

Quite evidently, the trial judge believed he had substantially complied with the request and, quite as evidently, Manton's counsel was then of the same view. For he not only assented to the suggestion that the various matters had all been covered but further evinced his satisfaction by failing to enter an exception after his attention pointedly had been called to the subject. If, instead of remaining silent, he had spoken, an opportunity would have been afforded the trial judge to ascertain from counsel the precise point of difference between what was requested and what was given. We cannot avoid the conclusion that such a course would have borne fruit, in view of the expressed willingness of the judge substantially to follow the request and his belief that he had done so.

A somewhat similar situation was presented to the Supreme Court in Boyd v. United States, 271 U.S. 104, 108, 46 S. Ct. 442, 443, 70 L.Ed. 857. In that case, as in this, the trial judge had given, at appellant's suggestion, an additional instruction to the jury, and Mr. Justice Van Devanter, speaking for the Supreme Court, answered the claim of error on the part of appellant by saying: "With that addition the charge elicited no criticism or objection from the defendant, although there was full opportunity therefor. It evidently was regarded as consistent and satisfactory. Besides, in view of what was said in other parts of the charge, we are justified in assuming that, had the court's attention been particularly drawn at the time to the part complained of now, it would have been put in better form. Certainly, after permitting it to pass as satisfactory then, the defendant is not now in a position to object to it. McDermott v. Severe, 202 U.S. 600, 610, 26 S.Ct. 709, 50 L.Ed. 1162; United States v. U. S. Fidelity & Guaranty Co., 236 U.S. 512, 529, 35 S.Ct. 298, 59 L.Ed. 696; Norfolk & Western Ry. Co. v. Earnest, 229 U.S. 114, 119, 120, 33 S.Ct. 654, 57 L.Ed. 1096, Ann.Cas. 1914C, 172." See also San Antonio & A. P. Ry. v. Wagner, 241 U.S. 476, 480, 36 S.Ct. 626, 60 L.Ed. 1110; Harrison v. United States, 2 Cir., 7 F.2d 259, 261, 262.

It is fair to conclude that the introduction of the point now is a mere afterthought. Even in the Manton brief, it is not listed as a substantive error but, in the shortest possible terms, is treated only as an instance of what is called the hostil-

ity and unfairness of the trial judge. And it was not until counsel came to write a reply brief, by leave of the court after the argument was concluded, that really serious consideration was given to the matter or any reference made to the plain error proviso.

 If the failure to enter an exception or assign error had been a mere inadvertence the matter might stand in a different light. But that view cannot be indulged. Plainly enough, counsel consciously and intentionally failed to save the point and led the trial judge to understand that counsel was satisfied. We see no warrant for the exercise of our discretion to set aside standing rules, so necessary to the due and orderly administration of justice, and review the challenge to the legal accuracy of the charge where, as here, the failure of the judge to follow the text of the requested instruction was, at the last, induced by the action of counsel; and where, moreover, the evidence of guilt is convincing.

### Spector's Case.

We pass now to a consideration of the case of Spector. Most of the contentions urged in his behalf are the same as those advanced by Manton and have already been answered. The only remaining question which we find it necessary to consider is whether the evidence was sufficient to warrant the trial court in submitting the case to the jury.

 *First.* The theory of the indictment and of the prosecution at the trial is that Spector, although not one of the original conspirators or connected with its consummation generally, knowingly joined the general conspiracy and participated in the execution of its purposes in so far as they related to the Schick case.

It is not required that each of the conspirators shall participate in, or have knowledge of, all its operations. He may join at any point in its progress and be held responsible for all that may be or has been done. Allen v. United States, 7 Cir., 4 F.2d 688, 692; Baker v. United States, 4 Cir., 21 F.2d 903, 905; Rudner v. United States, 6 Cir., 281 F. 516, 519; Commonwealth v. Anderson, 64 Pa.Super. 427. The evidence warrants a finding that Andrews was a party to the general conspiracy. His special interest was of course in the Schick case; and he had joined with Fallon and Renkoff in the effort to secure Manton's corrupt action in that case. Ren-

koff having dropped out, Andrews sought and obtained the assistance of Spector in the further prosecution of this criminal enterprise. As already appears, Andrews made many payments of money to Spector aggregating a very large sum. On one occasion a payment of $7,500 made to Spector was first designated as a 90-day loan to him. Spector, after some hesitation, agreed to give his note for the amount. He failed to do so and the amount, having first been entered as prepaid insurance, was later entered in the suspense account and finally charged to Andrews personally.

We have already discussed the way in which Spector lent himself as an intermediary between Andrews and Manton to transfer from the former to the latter the large sums of money which were loaned. And it is quite evident that the purpose of such action was to conceal the true character of the transactions. In that connection a significant item of evidence may be cited. Spector had received from Andrews $5,000. Instead of transferring the sum by one check to Manton's secretary, he first drew a check for $2,437.60 and a day or two later another check for $2,562.40, the two aggregating $5,000, the proceeds of both finding their way into the hands of a Manton corporation. On another occasion the sum of $5,000 was divided into two checks, one for $2,615.66 and the other for $2,384.-34. Both checks bear the same date and the proceeds followed the same course as in the preceding instance. Taken in connection with other evidence, it is hard to explain these devices upon any other theory than that they were adopted to conceal the real facts and to aid in the consummation of the criminal conspiracy. Certainly they are not the accompaniments of honest business. The circumstances of secrecy, intrigue and deviousness, and the attempts to conceal the real nature of the transactions, which the evidence discloses, are hallmarks of fraud and dishonesty, justifying the jury's conclusion that a criminal conspiracy existed to influence and obstruct the administration of justice and defraud the United States of its right to the conscientious action of the defendant Manton free from corruption; and that Spector knowingly became a party to that conspiracy. Spector may have thought the conspiracy did not go beyond the Schick case, but that is immaterial. In a case like this, it is enough that a convicted defendant knew he had connected himself with a criminal con-

spiracy, even though he was unaware of its full extent. A charge of engaging in a far-reaching conspiracy cannot be avoided by showing that what the accused conceived to be a limited conspiracy turned out to be a conspiracy of wider range, of which the supposed smaller one, in fact, was but a segment.

The conclusion of the jury as to Spector's connection with the conspiracy is greatly fortified by statements in the nature of a confession which were made by him after the final termination of the Schick case.

The decision of the court in Andrews' favor was handed down April 12, 1937, and in June of the same year Spector had a conversation with one Chaperau. Spector told Chaperau that he was going to Europe to dispose of some foreign rights in an electric razor. Spector showed him a letter of introduction from Judge Manton to someone in England. Chaperau gave Spector a letter to a London solicitor and Spector inquired with respect to the possibilities of raising capital and was informed by Chaperau that patents were not regarded favorably on the other side because of the fear that someone would infringe on them. Spector replied that there was nothing to worry about; that the Dictograph Company had secured the reversal by the Circuit Court of Appeals of an adverse decision in a lower federal court for which he, Spector, was responsible. Spector said: "I put the G— d—— deal over all by myself. No one can infringe on us and the patent situation is an excellent one and if anyone were to go into the business, they could put them out of business."

In the light of the foregoing, there can be no doubt that the case was properly submitted to the jury.

 *Second.* But the conclusion would not be otherwise even if we reject the view that Spector was criminally connected with the general conspiracy and assume that the verdict cannot be sustained unless upon the theory that Spector was involved in a distinct and separate conspiracy; for the position which Spector takes on the basis of that assumption, to the effect that a fatal variance would then result between the allegations and the proof, is without merit. The trial judge was careful to tell the jury that they must confine themselves, in passing upon the question of Spector's guilt or innocence, to the evidence which related to him, without reference to that which related only to the defendant Manton; and that they were to limit their consideration to the facts of the Schick case with which the testimony connected Spector. Thus the attention of the jury was pointedly directed and confined to the specific facts relating to Spector.

If, then, the view be adopted that Spector was not a party to the general conspiracy alleged, the effect of the evidence would be to split the conspiracy, so far as Spector alone is concerned, into two: one, the general conspiracy; and the other, a smaller one, confined to the Schick case. Some of the circuit courts of appeals have held that this would constitute a fatal variance, but the Supreme Court in Berger v. United States, 295 U.S. 78, 81, 55 S.Ct. 629, 630, 79 L.Ed. 1314, rejected that concept, holding that it ignored the question of materiality and "should be so qualified as to make the result of the variance depend upon whether it has substantially injured the defendant."

In reality, the attack made upon the verdict is not that the evidence does not prove the smaller conspiracy but that it proves more. In the Berger case it was pointed out that the general rule in criminal cases in respect of variances is based upon the requirements (1) that the accused shall be informed of the charge against him so that he may not be taken by surprise and (2) that he may be protected against another prosecution for the same offence. "The true inquiry, therefore," the Court said, "is not whether there has been a variance in proof, but whether there has been such a variance as to 'affect the substantial rights' of the accused." Certainly there has been no such variance in respect of Spector in the present case. The indictment is explicit in its allegations. It alleges in a separate paragraph the pendency of the appeal in the Schick case and that it was a part of the conspiracy alleged in the indictment that the co-conspirator Andrews "would pay and cause to be paid, directly and indirectly, to the defendant George M. Spector, certain sums of money * * * and that the defendant George M. Spector would turn over said sums of money * * * to the defendant Martin T. Manton, directly and indirectly, and for his use and benefit through his interest in the Manton corporations as aforesaid, * * *" The proof at the trial corresponds with these

allegations, so that the case is controlled by the language used by the Supreme Court in the Berger case: "The proof here in respect of the conspiracy with which Berger [Spector] was not connected may, as to him, be regarded as incompetent; but we are unable to find anything in the facts * * * or in the record from which it reasonably can be said that the proof operated to prejudice his case, or that it came as a surprise; and certainly the fact that the proof disclosed two conspiracies instead of one, each within the words of the indictment, cannot prejudice his defense of former acquittal of the one or former conviction of the other, if he should again be prosecuted." (295 U.S. page 83, 55 S.Ct. page 631, 79 L.Ed. 1314.)

We have not been unmindful of other contentions made by both appellants; but we do not discuss them because either they have been sufficiently covered by what we have already said or they are so clearly without substance as to make a review of them unnecessary. After a careful consideration of the entire record, we find nothing to warrant a reversal of the judgments of the trial court and, accordingly, they are affirmed.