**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**William VANOVER and Vernon Vanover,**
**Defendants-Appellants.**

**No. 14608.**

United States Court of Appeals
Seventh Circuit.

Jan. 5, 1965.

Thomas Meyer Belleville, Ill., Meyer & Meyer, Belleville, Ill., for appellants.

Carl W. Feickert, U. S. Atty., Robert F. Quinn, E. St. Louis, Ill., for appellee.

Before SCHNACKENBERG, KNOCH and KILEY, Circuit Judges.

SCHNACKENBERG, Circuit Judge.

William Vanover and Vernon Vanover, defendants, have appealed from a judgment of conviction by the district court, following a jury trial on an indictment charging violations of 18 U.S.C.A. §§ 371, 2312 and 2313, in conspiring to transport, receive, conceal, store, barter, sell and dispose in interstate commerce of stolen motor vehicles, knowing the same to have been stolen.

There was evidence tending to prove a conspiracy, as well as the overt acts charged in the indictment. That evidence tended to show that defendants, doing business as AAA Auto Salvage and Wrecking Company, in East St. Louis, Illinois, from April, 1962, made auto salvage the principal part of their business. In November 1962, Arvester Hawkins and Hollis Freeman operated a garage in St. Louis, Missouri, at which time Newton Bailey, Jr., previously an employee of William Vanover, came with another man to defendants' office, where a conference was held. Later, Bailey brought Hawkins to William Vanover and they talked about bringing auto parts. At that time, Hawkins worked in St. Louis dismantling automobiles which he had bought for $75 to $100 each. The cars were in good running condition.

On December 10, 1962, Hawkins was driving a truck loaded with dismantled parts of a Chevrolet car, except for the transmission. He picked up Bailey and they drove to AAA Auto Salvage. They arrived in the evening and the truck was unloaded. Hawkins talked with William Vanover, who gave to Hawkins a check payable to Bailey.

After unloading the parts of this Chevrolet, William Vanover told his employee, Robert Zimmerman, to put them all over the lot.

Hawkins made a second car delivery on December 17, 1962 and a check in payment was made in the maiden name of Gloria Harris and was given to her at

her home in East St. Louis by Hawkins. Hawkins asked her if he could use her name since he did not have any identification. Hawkins came to the house with Hollis Freeman. Mrs. Harris cashed the check next day, while Hawkins and Freeman waited in the car.

At the second delivery, Hawkins told William Vanover that he "needed cash to pay the guys that got the cars, because they wouldn't want to wait until he cashed the check the next day." He also said in the presence of Zimmerman and Bill Fosnock, another employee of the Vanovers, that he was paying $100 to the men who got the cars for him.

After the delivery on December 17, 1962, two doors, the front end, transmission, engine, rear section, tires and wheels were sold to various customers.

William Vanover explained to Fosnock that the parts received were scattered in different places in the yard and covered with the floor matting out of old cars "to cover them up" and one day when a part was not covered, William said "Cover that stuff; it is hot." Fosnock testified that William also said "Cover it back up to make it look like a dog house; and if anybody asks you we keep dogs in them" and "Make it look like a dog house."

A Galaxie Ford was stolen from Otis Jones in December 1962. On December 31, 1962 the rear end, engine, transmission and rear clip of such a car were delivered by Hawkins to the Vanovers and a check was made by William Vanover to Robert Hadley, who accompanied Hawkins from St. Louis with the parts.

The record before us contains other similar transactions occurring on and prior to March 7, 1963. We will not encumber this opinion by setting them out in detail.

William Vanover on March 12, 1963 learned that Fosnock and Zimmerman had talked to an agent of the Federal Bureau of Investigation and he then instructed his employees in the salvage yard to load a truck with automobile parts that he had purchased from Hawkins, and defendants directed Mark Vanover, a brother of defendants, to take the truck to Mark's home at Sparta, Illinois. William stated that Vernon was to then take the truck from Sparta to Chester, Illinois, where their father ran an auto salvage yard and that the parts would be sold at that location. William supervised the loading of the truck in the yard. While Vernon Vanover did not help load the truck, he did arrive at the yard just before it pulled away and discussed with William the truck's going to Sparta.

By using a wrecker, Mark pulled the truck to Sparta. Following the service of a search warrant on Mark, special agent McKinstray of the FBI made an inventory of the parts on the truck and took them to a public warehouse.

On March 19, 1963, St. Louis police officer Moynihan saw Hawkins cutting up a car and arrested him. He was found guilty but has not joined in this appeal.

Various witnesses testified as to their identification of cars or parts of cars which they had owned and which had been stolen from them.

1. The Vanover defendants [1] contend that the district court erred in denying a motion for an acquittal at the conclusion of the government's evidence and that the verdict was contrary to the manifest weight of the evidence. They concentrate on the basic premise that knowledge was not proven by the government. They refer to a knowledge that the automobile parts which the Vanovers received from defendant Hawkins were stolen. We are convinced, however, that the evidence, direct and circumstantial, was sufficient to justify the jury in finding the defendants had such knowledge, that they were guilty of the conspiracy as charged and that the various transactions to which we have referred as established by the evidence were performed in furtherance of that conspiracy. Blu-

1. They will be hereinafter referred to as defendants, except where otherwise indicated.

menthal v. United States, 332 U.S. 539, 68 S.Ct. 248, 92 L.Ed. 154.

In Glasser v. United States, 315 U.S. 60, at 80, 62 S.Ct. 457, at 469, 86 L.Ed. 680 (1942), the court said:

"It is not for us to weigh the evidence or to determine the credibility of witnesses. The verdict of a jury must be sustained if there is substantial evidence, taking the view most favorable to the Government, to support it. United States v. Manton, 2 Cir., 107 F.2d 834, 839, and cases cited. Participation in a criminal conspiracy need not be proved by direct evidence; a common purpose and plan may be inferred from a 'development and a collocation of circumstances'. United States v. Manton, supra. We are clear that, from the circumstances outlined above, the jury could infer the existence of a conspiracy and the participation of Roth in it. * * * "

Although this court in United States v. Bucur, 7 Cir., 194 F.2d 297 (1952), reversed a conviction of conspiracy to transport stolen motor vehicles in interstate commerce, Judge Lindley, at 301, said:

"Finally, on the question of proof, defendant urges that there was no showing that he was a party to any conspiracy to transport stolen vehicles in interstate commerce. True, there is no proof of an express agreement among the three alleged co-conspirators, but such evidence is not necessary. United States v. Gordon, 7 Cir., 138 F.2d 174. Conspiracy may be inferred from 'evidence of relationships and conduct and other probative circumstances.' Phelps v. United States, 8 Cir., 160 F.2d 858, 867, certiorari denied, Peters v. United States, 334 U.S. 860, 68 S.Ct. 1525, 92 L.Ed. 1780. Where the evidence shows a general plan or scheme, employed in a number of instances to bring about illegal results, upon a showing that

two or more persons engaged in interrelated steps of the plan, an inference of conspiracy is justified. United States v. Gordon, supra. Here the evidence of a concerted scheme, in which Minich, Honea and Bucur each played essential, coordinated roles, was such that it required submission to the jury."

2. The government produced as a witness Carson Boyd, a title examiner supervisor in the motor vehicle registration division of the Missouri department of revenue, and showed that he is official custodian of the records of automobile title applications pursuant to the law of Missouri. Boyd identified government's exhibits 1 through 6 as applications for Missouri titles to motor vehicles, maintained by the department of revenue in the regular course of business.[2] He testified that the application is a part of the title but is not physically attached to it, and that the top portion of the application is photostatted and sent to the applicant therefor. He identified as the official record of the department the application, not the photostatic copy sent to the applicant.

Defendants contend that the exhibits 1 through 6 should not have been admitted into evidence and that "they are not the titles themselves".

█ Defendants in their brief presume that these exhibits were offered in evidence under 28 U.S.C.A. § 1732. From this premise they argue that, in order to be admissible, these applications must be made in the regular course of business *by the applicant* and they must be made in the regular course of *his* business. However, the government relies on 18 U.S.C.A. Rule 26 of the Federal Rules of Criminal Procedure, which provides in part:

" * * * The admissibility of evidence and the competency and privileges of witnesses shall be governed, except when an act of Congress or these rules otherwise provide, by the principles of the com-

2. Actually they are processed reproductions of the originals.

mon law as they may be interpreted by the courts of the United States in the light of reason and experience."

These applications were received by the state department of revenue in the normal course of business. The presumption of regularity supports the official acts of public officers and, in the absence of clear evidence to the contrary, courts presume that they have properly discharged their official duties. United States v. Chemical Foundation, 272 U.S. 1, 14, 47 S.Ct. 1, 71 L.Ed. 131. The basis of fact on which the director of revenue acted will not be reviewed by this court.

Section 301.190 of the Missouri Revised Statutes, V.A.M.S. imposes a duty on the director of revenue to "use reasonable diligence in ascertaining whether the facts stated in such application are true, and, if satisfied that the applicant is the lawful owner of such motor vehicle * * * or otherwise entitled to have the same registered in his name, shall, thereupon issue an appropriate certificate * * *".

■ In this proceeding, the court below had a right to assume that the Missouri official performed his duty with reasonable diligence in issuing the certificates of title here involved.

■ Defendants' second objection to exhibits 1 through 6 is that they violate the best evidence rule. However, it should be noted that this is not a case where secondary evidence is being offered and hence that rule does not apply.

In addition to what we have said in regard to exhibits 1 through 6, it is well to note that there was the testimony in open court of the owners of the automobiles in question as to their ownership of the cars.

We find no error in the admission in evidence of government exhibits 1 through 6.

3. Defendants assign as error the admission of the testimony of government witnesses Catherine Jones, Jesse Jones and Henry Turner, in regard to their ownership of certain Pontiac automobiles, all of which was admitted, so they say, over defendants' objection. They also assign as error the alleged refusal by the court to strike the testimony of said witnesses in respect to the subject matter of said testimony.

■ However, the government denies that defendants made objection to the admission of said evidence or moved to strike it. We have consulted not only the appendix filed by defendants but also the pertinent parts of the trial transcript. The government is right in its contention in regard to these matters and it is not necessary for us to consider whether or not error occurred in this respect, because, if it did, it has been waived by defendants' failure to preserve the alleged error for review. United States v. Kanton, 7 Cir., 264 F.2d 588, 591 (1959), and Duke v. United States, 9 Cir., 255 F.2d 721, 727 (1958), cert. denied 357 U.S. 920, 78 S.Ct. 1361, 2 L.Ed.2d 1365.

■ 4. Wardell Jordan, a government witness, testified that he had entered a plea of guilty in this case and that he knew defendant Hawkins, whereupon defense counsel objected to Jordan testifying, on the ground that "a co-conspirator is not allowed to testify until the conspiracy has been proven, and at this point a conspiracy had not been proven". It is insisted that the court erred in admitting Jordan's testimony over that objection.

In United States v. Sansone, 2 Cir., 231 F.2d 887 at 893 (1956), cert. den. 351 U.S. 987, 76 S.Ct. 1055, 100 L.Ed. 1500, the court said:

"* * * Nor does it make any difference that when the evidence concerning the sale of July 3 was introduced, the prosecution had not yet proved appellant's connection with the conspiracy. The order in which evidence is received is within the discretion of the trial court. United States v. Pugliese, 2 Cir., 1945, 153 F.2d 497, 500; Cohen v. United States, 2 Cir., 1907, 157 F.

651, 655, certiorari denied 207 U.S. 596, 28 S.Ct. 261, 52 L.Ed. 357; Hoeppel v. United States, 1936, 66 App.D.C. 71, 85 F.2d 237, 242, certiorari denied 299 U.S. 557, 57 S.Ct. 19, 81 L.Ed. 410; rehearing denied 299 U.S. 622, 57 S.Ct. 188, 81 L.Ed. 458. Since the jury could conclude from the evidence that appellant had been a member of the conspiracy not only on July 3, 1951, when the sale objected to was made, but as early as 1949, the evidence of the sale was admissible."

We are convinced that the court properly received Jordan's testimony at the time it was offered.

5. Defendants further contend that it was error "to allow certain photographic exhibits to be viewed by the jury with a legend on the back of them, which legend had been ordered by the court to be removed".

Defendants point out that the court sustained their objection to government exhibits 36 through 42 (certain pictures) unless the legend contained on them was removed before they were taken to the jury room. Evidently through inadvertence, the legends were not removed from the pictures. A policeman had testified in regard to the legends. Defendants admit that what occurred was done inadvertently.

■ There are at least two answers to this contention. First, there is no indication that the legends were prejudicial to defendants and, secondly, it was as much the duty of defense counsel to see to it that the legends were removed as it was for the court or government counsel. Either of these reasons sufficiently justifies us in refusing to reverse on the ground now asserted.

■ 6. It was not until their motion for a new trial that defendants objected to the remarks of the prosecutor in his closing argument wherein (they now tell us), he stated "Punishment or probation is up to the judge and not the jury, nor sympathy nor any other consideration".

We find no reversible error here and base our holding on each of the following grounds: First, failure to raise the point during the trial, and secondly the court instructed the jury as follows:

"Now, punishment, if any, is not to be considered by the jury. That is a matter wholly within the province of the Court."

We fail to see how the fact that the jury became acquainted with the distinction between its function and that of the court in any way prejudiced the defendants.

7. Lastly defendants contend that two instructions given by the court were erroneous.

Without going into detail, they charge generally that instruction No. 1 was repetitious of other instructions, which they do not identify, and that it consisted of "seven pages in length and reiterates time and again what is a conspiracy". They complain because this instruction "does not contain a sufficient, or any, explanation as to what is 'knowledge' ". Defendants tendered no instruction on this subject.

We have carefully read the instruction in question and cannot believe that the jury was in any way confused or misled as to the law applicable to this case. In the course of an explanation to the jurors of the nature of criminal conspiracy, the court attributed to Mr. Justice Holmes this definition: "A conspiracy is a partnership in criminal purposes". Defendants make a special attack upon this part of the instruction. We think that the quoted language, in conjunction with the accompanying words in the instruction of the court, was helpful to the jury in understanding its duty in this case. Certainly the authorship of the quoted statement is of the highest caliber.

In this court defendants contend that given instruction No. 3 is erroneous. It reads:

"Possession of property recently stolen, if not satisfactorily explained, is a circumstance from which the

jury may reasonably draw the inference and find that the person in possession knew the property had been stolen. The same inference may reasonably be drawn from a false explanation of such possession.

"The term 'recently' is a relative term which has no fixed meaning. Whether property may be considered as recently stolen depends upon the nature of the property and all the facts and circumstances shown by the evidence. The longer the period of time since the theft, the weaker the inference which may be drawn from unexplained possession.

"If you find from the evidence beyond a reasonable doubt that the motor vehicles described in the indictment were stolen, and were transported in interstate commerce as charged, and that, while recently stolen, the motor vehicles were in the possession of the accused in another state than that in which they were stolen, the jury would be justified in drawing from those facts the inference that the accused had knowledge that they were stolen, unless possession of the recently-stolen property by the accused in such other state is explained to the satisfaction of the jury by other facts and circumstances in evidence.

"It is the exclusive province of the jury to determine whether the facts and circumstances shown by the evidence warrant any inference which the law permits the jury to draw from possession of recently-stolen property. If any possession the accused may have had of recently-stolen property is consistent with innocence, then the jury should acquit the accused."

Defendants complain that the third paragraph of this instruction, while it may be a correct statement of the law as to a violation of the Dyer Act, is not a correct statement of the law for a violation by conspiracy and that "these facts alone, which are above recited, do not show a conspiracy to exist."

The purpose of instruction No. 3 was not to state the law on conspiracy. It dealt only with the subject of possession of property recently stolen as a circumstance bearing upon the question of knowledge by defendants that it was stolen. For that purpose it was a proper instruction and therefore we find no error in the court's giving it to the jury.

For these reasons, the judgment from which this appeal has been taken is affirmed.

Judgment affirmed.